05-3600-cr(L)
USA v. Blech (Rittweger)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: Oct. 23, 2007          Decided: April 23, 2008)

Docket Nos. 05-3600-cr(L); 05-3766-cr(CON); 05-3769-cr(CON)

————————————————————————————

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

THOMAS MICHAEL RITTWEGER, VICTOR M. WEXLER, also known as "Fat Boy," also known as "Screw," DOUGLAS C. BRANDON,

*Defendants-Appellants.*

————————————————————————————

Before:     SOTOMAYOR, B.D. PARKER and HALL, *Circuit Judges*.

————————————————————————————

We hold that joinder of the charged conspiracies was permissible under Federal Rule of Criminal Procedure 8(b) because the indictment alleged that the conspiracies shared a common plan or scheme and a substantial identity of facts or participants. We also hold that the district court did not abuse its discretion in finding that no prejudice compelled severance under Federal Rule of Criminal Procedure 14. As the district court concluded, this was not a case in which there was any reasonable possibility that the jury could not follow the court's instructions and consider the case against each defendant separately. Further, although the government's failure to provide *Brady* materials earlier in the trial process is troublesome, its actions do not require reversal of defendant Douglas C. Brandon's conviction because there is no reasonable probability that the delay affected the outcome of the case or otherwise deprived Brandon of a fair trial. We therefore AFFIRM the defendants' convictions.

————————————————————————————

FRANK HANDELMAN, New York, New York,
*for defendant-appellant Thomas Michael Rittweger.*

1

PETER E. FLEMING, Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, New York, *for defendant-appellant Victor M. Wexler*.

THOMAS E. ENGEL, Engel, McCarney & Kenney LLP, New York, New York, *for defendant-appellant Douglas C. Brandon*.

ANDREW L. FISH, Assistant United States Attorney (Katherine Polk Failla, *of counsel*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for appellee*.

SOTOMAYOR, *Circuit Judge*:

This appeal addresses whether the joinder of defendants under Federal Rule of Criminal Procedure 8(b) ("Rule 8(b)") is proper when the overwhelming evidence presented at trial concerned proof of a conspiracy that involved some, but not all, of the named defendants. Because the indictment alleged the existence of two conspiracies that shared a common plan or scheme and a substantial identity of facts or participants, we hold that joinder was permissible under Rule 8(b). We further hold that, in light of the relatively straightforward nature of the evidence at issue and the district court's careful limiting instructions to the jury, defendants Victor M. Wexler and Douglas C. Brandon failed to meet the heavy burden of persuasion to reverse a trial court's decision not to grant severance under Federal Rule of Criminal Procedure 14 ("Rule 14").

This appeal also raises an issue of whether the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to produce arguably exculpatory evidence with respect to Brandon until the week of trial. Although the government should have disclosed this evidence sooner, there is no reasonable probability that the delay affected the outcome of the case so as to

2

require reversal of Brandon's conviction. We therefore AFFIRM the defendants' convictions.[1]

**BACKGROUND**

The facts of this case as they relate to each defendant are set forth more fully in the district court opinion, familiarity with which is presumed. *See United States v. Rittweger*, 259 F. Supp. 2d 275, 279-83 (S.D.N.Y. 2003).

## I. Indictment

Defendants Thomas M. Rittweger ("Rittweger"), Douglas C. Brandon ("Brandon") and Victor M. Wexler ("Wexler"), together with Richard J. Blech ("Blech") and Robert S. DeHaven ("DeHaven"), were charged in a thirteen-count indictment returned on January 31, 2002. On April 9, 2003, the Grand Jury returned a superseding indictment (the "Indictment") against the defendants. Blech, however, pled guilty to the original indictment and was named only as a co-conspirator in the superseding indictment.

## II. Schemes Alleged

The Indictment sets forth two schemes. Counts One through Eight allege the "First Scheme," which includes charges of: conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. Counts Nine through Thirteen allege the "Second Scheme," which includes charges of:

---

[1] In a companion summary order, we address and reject defendants' remaining claims concerning the sufficiency of evidence produced at trial; the erroneous introduction of a co-conspirator's guilty plea allocution; the exclusion of certain statements made between Wexler and another co-conspirator; attacks on defendant Thomas M. Rittweger's sentence; Rittweger's ineffective assistance of counsel claim; and numerous other challenges submitted in Rittweger's *pro se* supplemental brief.

3

conspiracy to commit securities fraud, wire fraud, and commercial bribery in violation of 18 U.S.C. § 371; and using facilities of interstate commerce to carry on and facilitate commercial bribery in violation of 18 U.S.C. §§ 1952(a)(3) and 2.

As part of the First Scheme, the Indictment alleges that from about 1996 through about 1999, Rittweger and Brandon, together with Blech and other co-conspirators, participated in a scheme to defraud customers of Credit Bancorp, Ltd. ("CBL")—a group of related United States and foreign business organizations that purported to provide "financial engineering" and investment services—of at least $210,000,000 by fraudulently inducing them to invest cash, securities, and other assets in two CBL investment programs: the "CBL Insured Credit Facility" and the "CBL Insured Securities Strategy." The customers did so in the expectation of receiving dividend payments and loans with favorable terms. The Indictment asserts that CBL was actually a Ponzi scheme, in which the proceeds from investments in the programs were paid to earlier investors to create the false appearance that the investments were profitable, thereby inducing additional customers to invest assets with CBL.

The Indictment charges that in furtherance of the First Scheme, Rittweger and Brandon, together with Blech and other co-conspirators, made and caused others to make false and misleading representations to prospective customers. It further alleges that Rittweger, Brandon, and Blech falsely represented that Brandon would serve as a trustee on behalf of those customers who invested in the CBL Insured Credit Facility and would hold the invested assets in custodial accounts under his control. According to the Indictment, Rittweger, Brandon, and Blech knew that Brandon had neither control over the accounts into which the CBL customer assets were invested, nor the ability to fulfill his duties as trustee. Rittweger and Blech also allegedly

4

misrepresented that assets invested in the CBL Insured Securities Strategy would be placed in mutual funds and other financial instruments, when they knew that a substantial portion of the assets were used to pay for unauthorized business and personal expenses instead.

The Second Scheme involves Rittweger, Wexler, and co-conspirator DeHaven, who was an officer of Mitsui Trust Company ("Mitsui"), a Japanese financial institution. DeHaven worked in Mitsui's New York office and was responsible for Mitsui's participation in securities lending transactions. The Indictment alleges that DeHaven owed fiduciary and other duties of trust and honest services to Mitsui. The Indictment asserts that Wexler, a personal friend of DeHaven, referred potential customers to CBL in return for payments from CBL, and also managed a foreign exchange trading business affiliated with CBL.

With respect to the Second Scheme, the Indictment further alleges that from about 1997 through 1999, Rittweger, DeHaven, and Wexler, together with Blech and other co-conspirators, participated in a scheme to defraud customers by inducing them to invest cash, securities, and other assets in the CBL Insured Credit Facility. In furtherance of this scheme, the conspirators allegedly made and caused others to make numerous false and misleading representations, including the claim that Mitsui had invested securities worth approximately $50,000,000 or more with CBL, when they knew that Mitsui had made no such investment.

## III. Jury Verdict

After a seven-week trial before the United States District Court for the Southern District of New York (Koeltl, J.) that ended on June 26, 2003, the jury returned the following verdicts: Rittweger was found guilty of Counts One through Thirteen (relating to both the First and the Second Schemes); Brandon was found guilty of Counts One and Three through Eight (relating to

5

the First Scheme); Wexler was found guilty of Counts Nine through Thirteen (relating to the

Second Scheme); and DeHaven was found guilty of Counts Nine through Thirteen (relating to

the Second Scheme).[2]  The jury was unable to reach a verdict with respect to Count Two against

Brandon, and the jury could not agree whether securities fraud was an object of the conspiracy

charged in Count Nine.

This timely appeal followed.

## DISCUSSION

This appeal presents two issues: first, whether the district court erred by denying

defendants' motions to sever under Rules 8(b) and 14; second, whether a *Brady* violation

occurred when the government failed to produce certain allegedly exculpatory evidence relating

to Brandon until the week of trial.  We reject defendants' challenges as to both issues.

## I.     Joinder and the Denial of Severance

Brandon and Wexler argue that the district court erred by failing to grant their motions for

misjoinder and/or severance under Rules 8(b) and 14 on the grounds that the indictment alleged

unrelated conspiracies and that they suffered undue prejudice as a result.  We disagree.

### A.     Rule 8(b)

We review the propriety of joinder *de novo*.  *United States v. Shellef*, 507 F.3d 82, 96 (2d

Cir. 2007).  "[T]he propriety of Rule 8 joinder is subject to full appellate review, and where

joinder should not have been permitted, a conviction must be reversed, unless failure to sever

was harmless error."  *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (internal

---

[2]  DeHaven does not challenge his conviction or sentence and is not a party to the instant appeal.

quotation marks and citations omitted).

Rule 8(b) allows joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). We have interpreted the "same series of acts or transactions" language of Rule 8(b) to mean that "joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'" *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (quoting *Attanasio*, 870 F.2d at 815). In this context, we also "apply a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *Shellef*, 507 F.3d at 98 (citing *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988)).

Here, the indictment alleges that both the First Scheme and the Second Scheme were efforts to induce CBL customers to invest cash, securities, and other assets in the CBL Insured Credit Facility. Further, the allegations describe Rittweger and Blech as key participants in both schemes. For example, as part of the First Scheme, the Indictment describes how Rittweger, Blech, and Brandon fraudulently induced various customers to invest assets in the CBL Insured Credit Facility by causing fictitious account statements to be sent to customers that falsely stated their assets had been used to purchase shares in mutual funds and other financial instruments. As part of the Second Scheme, Rittweger, Blech, and Wexler fraudulently induced customers to invest cash, securities, and other assets in the CBL Insured Credit Facility by making and causing others to make numerous false and misleading representations concerning a large financial

7

institution's investment in CBL. Thus, the conspiracies evince a "common plan or scheme," and there is a "substantial identity of facts or participants," *Attanasio*, 870 F.2d at 815 (internal quotation marks and citation omitted), to conclude that initial joinder was permissible under Rule 8(b).

Brandon and Wexler principally argue, relying on *United States v. Velasquez*, 772 F.2d 1348 (7th Cir. 1985), that as members of two distinct conspiracies, they should not have been joined as defendants in the same trial because the conspiracies were not and could not have been charged as a single conspiracy. *See id.* at 1353 ("The indictment need not charge a single overarching conspiracy, provided the separate conspiracies it charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy."). The language of Rule 8(b), however, does not require such a rigid application. *See United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (upholding joinder of co-defendants although neither party was charged in the conspiracy counts of the other). Indeed, in *United States v. Marzano*, 160 F.3d 399 (7th Cir. 1998), the Seventh Circuit distinguished its earlier decision in *Velazquez* for essentially this reason, and affirmed the Rule 8(b) joinder of members of two separate conspiracies. *Id.* at 401 (clarifying that although the "simplest case for joinder is where the defendants are charged with having conspired with each other," different conspiracies involving different defendants may be joined when they are part of the same "series of [illegal] acts or transactions"). Accordingly, whether the joinder of defendants in two conspiracies is warranted must be determined on a case-by-case basis. Provided that the defendants are "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," Fed. R. Crim. P. 8(b), members of two or more conspiracies

8

may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy. *See, e.g.*, *Attanasio*, 870 F.2d at 815 (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts").

Moreover, to the extent that Brandon and Wexler rely on the evidence (or lack thereof) adduced at trial to argue that they were improperly joined as defendants, their reliance is misplaced. Under the plain language of Rule 8(b), the decision to join parties turns on what is "alleged" in the "indictment." Fed. R. Crim. P. 8(b). Events that transpire at trial are thus not relevant to the Rule 8(b) inquiry. *See Marzano*, 160 F.3d at 401 ("The test set forth in [Rule 8(b)] is . . . what the indictment charges, not what the evidence shows."). This understanding is confirmed by the Supreme Court's decision in *Schaffer v. United States*, 362 U.S. 511, 517 (1960) (affirming Rule 8(b) joinder based on what was "charged in the indictment"), and comports with our prior application of Rule 8(b), *see, e.g*, *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("In evaluating the defendants' claims of misjoinder under Rule 8(b), then, our task is limited simply to determining whether the indictment properly alleged their participation in a RICO conspiracy."); *Pacelli v. United States*, 588 F.2d 360, 367 n.20 (2d Cir. 1978) ("What is necessary is that the defendants are 'alleged' to have participated in the same illegal act or series of acts.").[3]

---

[3] This case does not present the related issue of whether district courts in deciding Rule 8(b) motions may consider the government's pre-trial representations about what it believes the evidence will (or will not) show. *See United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994) ("In determining whether joinder of multiple defendants in a single prosecution is proper, this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the government."). In this case, the district court held—as do we—that the allegations in the indictment alone were sufficient to sustain the Rule 8(b) joinder. Without deciding the issue,

The question of whether Brandon and Wexler faced prejudice—or were in fact prejudiced—by joinder under Rule 8(b) presents the altogether separate inquiry of whether the trial of these defendants should have been severed under Rule 14. *See Schaffer*, 362 U.S. at 515 ("Petitioners overlook, however, that the joinder was authorized under Rule 8(b) and that subsequent severance was controlled by Rule 14 . . . ."); *see also United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) ("The question of the propriety of joinder under Rule 8 and of refusal to grant relief from prejudicial joinder under Rule 14 are quite different in nature, although some decisions tend to obscure this."). We therefore turn to Brandon and Wexler's claims that the district court abused its discretion by denying them a separate trial.

**B.      Rule 14**

Rule 14 provides in relevant part: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The Supreme Court has instructed that "the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer*, 362 U.S. at 516. Such prejudice exists, the Court explained, only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Motions to sever under Rule 14 are "committed to the sound discretion of the trial judge," *United States v. Chang An-Lo*, 851 F.2d

---

however, we caution that the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for the consideration of evidence at trial.

10

547, 556 (2d Cir. 1988), and in seeking to overturn the denial of a Rule 14 motion, the defendant bears a heavy burden: "[i]n order to secure a reversal, he must show prejudice so severe that his conviction constituted a miscarriage of justice," *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *see also United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (noting that the district court's discretion is "virtually unreviewable").

In the present case, Brandon and Wexler cannot meet this burden. In essence, they argue that the majority of the evidence introduced at trial was not admissible against them, but rather was relevant only to the other defendants. This, they claim, resulted in a spillover effect so prejudicial that they were denied a fair trial. We find this argument unpersuasive.

First, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983) (citations omitted); *see also United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982). Second, the evidence with respect to each of the defendants was sufficiently straightforward that the jury could consider it without any significant spillover effect. *See Carson*, 702 F.2d at 367. Indeed, the jury did not reach a unanimous verdict with respect to Count Two against Brandon or the securities fraud object of Count Nine. *See United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) ("[W]here the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, we have found no basis for concluding that a new trial was warranted because of prejudicial spillover. The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others."). Finally, the district court gave limiting instructions throughout the trial explaining when evidence could not be considered against a particular defendant, and the

11

jury charge carefully explained that the jurors must consider the case against each defendant separately. *See Zafiro*, 506 U.S. at 539-40; *United States v. Hernandez*, 85 F.3d 1023, 1029-30 (2d Cir. 1996) (rejecting a claim of confusion and spillover prejudice where trial court instructed jurors "to consider the evidence against each defendant individually for each count"). Therefore, despite our concern that no connection existed between Brandon and Wexler, and that the connection between the two charged conspiracies was tenuous, we do not find that the district court abused its discretion in denying severance.

Although, given the flexibility of the standard, we find no abuse in the district court's exercise of its discretion, we question the government's decision to try the two conspiracies together. As the government conceded at trial, Wexler had no knowledge of or participation in the First Scheme and Brandon had no knowledge of or participation in the Second Scheme. Given that evidence relating to the First Scheme is not strictly necessary to understanding the intent of the Second Scheme, the district court's conclusion that "evidence of both conspiracies and both sets of charges would be admissible as background evidence," would be highly questionable if Brandon and Wexler had been tried separately. *Rittweger*, 259 F. Supp. 2d at 284. Further, the government's admittedly "imprecise" lumping together of all of the conspirators during its rebuttal summation reflects the danger of joining relatively minor participants, who have discrete roles in a larger conspiracy, with the more prominent and active members of overlapping conspiracies. Rule 8(b) does not provide the government with limitless discretion to join defendants and does not absolve the government from an independent obligation to consider the unfairness that may result from joinder.

## II.    The Government's Disclosure of *Brady* Information

Brandon asserts that the government violated *Brady v. Maryland*, 373 U.S. at 87, when it did not produce the grand jury testimony of co-conspirator and cooperator Virginia Allen ("Allen") until the week prior to trial, and did not produce FBI Agent Debra Lubman's debriefing notes of Allen's interviews until just prior to Agent Lubman's direct testimony. Although we are troubled by the government's failure to produce this evidence sooner, we do not find that there is a reasonable probability that earlier disclosure of the information would have affected the outcome of Brandon's case.

The government has a duty to disclose evidence favorable to the accused that is material to guilt. *Id.* at 87. This disclosure obligation extends to information that, "if suppressed, would deprive the defendant of a fair trial," *United States v. Bagley*, 473 U.S. 667, 675 (1985), and such a deprivation occurs only where there is a "reasonable probability" that the suppression "affected the outcome of the case," *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001), or would have "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). *Brady* information, moreover, must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *see also Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) (finding *Brady* not satisfied where the government did not disclose details of a potential witness's knowledge because the defendant was left to gamble on what the witness would say). We have opined that "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the

13

defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated." *Leka*, 257 F.3d at 100.

Brandon contends that no later than March 2002—well over a year before trial commenced—he requested disclosure and production by the government of all *Brady* material. Although the government produced some two hundred boxes of documents in the fall of 2002, as noted above, it did not produce Allen's grand jury testimony until the week of trial, and did not produce Agent Lubman's debriefing notes until just prior to Agent Lubman's direct testimony.[4] Brandon claims that these documents contained exculpatory material consistent with his defense that he was unaware of the unlawful aims of the conspiracy with which he was charged.

In response, the government contends that Allen's prior testimony was not *Brady* material because the information "had no bearing on Brandon's guilt or innocence." We find this argument to be disingenuous. Brandon was charged with misrepresenting to potential investors that he was the sole signatory for an account that was under his exclusive control. In her grand jury testimony, Allen testified that Brandon was told that he was, in fact, a signatory on these accounts. Thus, when Brandon represented in the trust engagement letters that he was the "sole signatory" on a particular investor's account, Allen testified that she believed Brandon did not know this representation was false. Allen also testified that Brandon requested documentation showing that he was a signatory, but that she never provided this to him and was unaware of

---

[4] The government produced Allen's grand jury testimony pursuant to its obligations under the Jencks Act, 18 U.S.C. § 3500. Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500. *See Rodriguez*, 496 F.3d at 225-26 (recognizing independence of obligations under Jencks Act and *Brady*).

14

anyone else who did. Furthermore, she told Agent Lubman that she had been specifically instructed by Blech, "Don't tell Brandon anything" because he was "there for marketing purposes." Taken together, these statements quite obviously could be viewed as "favorable to the defendant," *Coppa*, 267 F.3d at 140, as they lend credence to Brandon's defense that he did not know he was not the sole signatory on the CBL accounts. *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (explaining that there is a due process obligation to disclose "material evidence favorable to the defendant").

We therefore are unable to accept the government's argument that Allen's statements were not *Brady* material because it believed, based on other circumstantial evidence, that Brandon had secured knowledge of the unlawful conspiracy. Frequently, the government comes into possession of evidence by witnesses who identify another perpetrator or who attempt to exculpate another defendant. The fact that the government may have some evidence that a particular defendant is guilty does not negate the exculpatory nature of the testimony of a witness with knowledge that a defendant did not commit the crime as charged. *See Leka*, 257 F.3d at 100 (finding a *Brady* violation and granting habeas relief based on prosecutor's failure to disclose off-duty police officer's observations of a crime scene that "w[ere] favorable to the defense" and contradicted the observations of two eyewitnesses who testified for the prosecution).

We acknowledge, however, that the district court found that the government's failure to disclose Allen's testimony and Agent Lubman's debriefing notes was not in bad faith, and we do not go so far as to overturn that conclusion. Nevertheless, the government should have acted in favor of disclosing the *Brady* material earlier, particularly when earlier discovery would not have had the potential to harm the witness. *Cf. Coppa*, 267 F.3d at 139 ("Favorable evidence includes

15

not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972))). After all, the government produced 200 boxes of materials in the fall of 2002 to defense counsel, but withheld until May 1, 2003 (the eve of trial) the evidence that the government counsel surely should have known defense counsel was most interested in.

But in order to require reversal, "the evidence in question [must] 'create[] a reasonable doubt that did not otherwise exist.'" *United States v. Romero*, 54 F.3d 56, 60-61 (2d Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (holding that to establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued"). This standard is met by showing a "reasonable probability" of a different result if the defense had learned of the evidence earlier. *See United States v. Petrillo*, 821 F.2d 85, 88-89 (2d Cir. 1987) (citing *Bagley*, 473 U.S. at 682).

Under the circumstances of this case, we conclude there is no probability that the government's late disclosure of the evidence resulted in a different outcome in Brandon's case. First and foremost, the district court admitted into evidence Allen's grand jury testimony and Agent Lubman's debriefing notes. The jury was read Allen's testimony regarding Brandon's role in the alleged conspiracy, and that she believed Brandon did not know he was not the sole signatory for all CBL insured trustee accounts. The jury was also read excerpts of the notes taken by Agent Lubman during proffer interviews of Allen, including statements that Brandon was never told that he was not a signatory on CBL's accounts. The exculpatory information was

16

therefore put before the jury and Brandon was able to assimilate the materials into his case for "its effective use at trial." *Coppa*, 267 F.3d at 135.

Second, similar information was elicited from Blech, who, as a key participant in both the First and the Second Schemes, had more direct and personal knowledge than Allen of what had been communicated to Brandon. Blech, for example, testified that Brandon did not have knowledge of where any of the CBL assets from clients were placed or held, except when supplied by himself, Allen or Rittweger. Brandon also did not have the ability to initiate any transactions or transfers with clients' assets that were placed in CBL's accounts. Further, Blech explained that Brandon did not receive account statements from any of the banks or brokerage firms involved in the CBL scheme, and Brandon had no control over the clients' assets that were being placed in those various accounts.

Finally, to the extent Brandon argues that Allen's absence at trial deprived him of other information, we see no reason to believe that Brandon's defense strategy would have been altered by earlier knowledge of Allen's grand jury testimony and interview with Agent Lubman; Brandon's defense was already premised on his alleged lack of knowledge of the false representations that were being made to investors in CBL. *See Romero*, 54 F.3d at 61 (citing the "dearth of alternative strategies for the defense" as a factor in the *Brady* analysis). Accordingly, we are disappointed by the government's failure to disclose the *Brady* material in a more timely fashion, but there was no "reasonable probability" that this delay affected the outcome of the case. *See id.*

## CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' convictions.