19-3806 (L)
USA v. Connolly

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2020

(Argued:  April 14, 2021                                    Decided: January 27, 2022)

Docket Nos. 19-3806-cr(L), 19-3944-cr(CON),
19-3945-cr(XAP), 19-3964-cr(XAP)

_____

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant*,

- v. -

MATTHEW CONNOLLY and GAVIN CAMPBELL BLACK,

*Defendants-Appellants-Cross-
Appellees*.

_____

Before:  KEARSE, CABRANES, and POOLER, *Circuit Judges*.

Appeals from judgments entered in the United States District Court for the Southern District of New York following a jury trial before Colleen McMahon, then-*Chief Judge*, convicting defendants of wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349, in connection with the London Interbank Offered Rate ("LIBOR"), and sentencing them principally to time-served and supervised release, including various periods in home confinement, and imposing monetary fines. On appeal, defendants contend principally that the trial evidence was insufficient to prove the falsity, materiality, or fraudulent intent elements of the offenses of which they were convicted.

Cross-appeals by the government to challenge the sentences imposed, contending principally that the district court failed to determine the availability of adequate monitoring for one defendant's home confinement and that that failure could result in punishment inadequate to reflect the court's assessment of the defendants' relative culpability.

Finding that the evidence was insufficient as a matter of law to permit a finding of falsity, we reverse the judgments of conviction and remand to the district court for entry of judgments of acquittal. The government's cross-appeals with regard to sentencing are thus moot.

Judgments reversed; cross-appeals dismissed as moot.

SANGITA K. RAO, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (Brian C. Rabbitt, Acting Assistant Attorney General, Criminal Division, Robert A. Zink, Acting Deputy Assistant Attorney General, Criminal Division, Alison L. Anderson, Assistant Chief, Fraud Section, Criminal Division, Carol L. Sipperly, Senior Litigation Counsel, Antitrust Division, Michael T. Koenig, Christina J. Brown, Trial Attorneys, Antitrust Division, United States Department of Justice, Washington, D.C., on the brief), *for Appellee-Cross-Appellant*.

KENNETH M. BREEN, New York, New York (Phara A. Guberman, Paul Hastings, New York, New York, on the brief), *for Defendant-Appellant-Cross-Appellee Connolly*.

SETH L. LEVINE, New York, New York (Scott B. Klugman, Miriam L. Alinikoff, Levine Lee, New York, New York, on the brief), *for Defendant-Appellant-Cross-Appellee Black*.

Schulte Roth & Zabel, New York, New York (Gary Stein, Elizabeth M. Sullivan, of counsel; Patterson Belknap Webb & Tyler, New York, New York, Harry Sandick, David S. Kleban, of counsel), *filed a brief for Amicus Curiae The New York Council of Defense Lawyers in support of Defendants-Appellants-Cross-Appellees*.

KEARSE, *Circuit Judge*:

Defendants Matthew Connolly and Gavin Campbell Black appeal from judgments entered in the United States District Court for the Southern District of New York following a jury trial before Colleen McMahon, then-*Chief Judge*, convicting both defendants on one count charging a 2004-2011 conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349, convicting Connolly on two counts of wire fraud in violation of 18 U.S.C. § 1343, and convicting Black on one count of wire fraud in violation of § 1343, all in connection with the submission of statements that could affect the London Interbank Offered Rate ("LIBOR"), on which many financial transactions rely. Connolly was sentenced principally to three concurrent terms of time served plus two years of supervised release (the first six months in home confinement), and was ordered to pay a $100,000 fine. Black was sentenced principally to two concurrent terms of time served plus three years of supervised release (the first nine months in home confinement) to be served in his native United Kingdom, and was ordered to pay a $300,000 fine. On appeal, defendants contend principally that the evidence at trial was insufficient to prove that the LIBOR submissions at issue were false, material, or made with fraudulent intent.

The government cross-appeals to challenge defendants' sentences, arguing that it constituted plain error to permit Black to serve a sentence of home confinement in the United Kingdom without adequate assurance that such a term of overseas home confinement could be appropriately monitored. It argues that both defendants should be resentenced because if the monitoring of Black were inadequate, it would result in punishment less severe for Black than that imposed on Connolly, despite the district court's assessment that Black was more culpable than Connolly.

Finding merit in defendants' contentions that the evidence was insufficient to show that the LIBOR-related statements that they induced were false, we reverse their convictions and remand to the district court for entry of judgments of acquittal. We dismiss the government's cross-appeals as moot.

## I. BACKGROUND

These prosecutions arise from the large-scale, widely publicized investigations conducted by financial regulators and prosecutorial authorities in the United States and the United Kingdom into the manipulation of LIBOR, described in

detail in *United States v. Allen*, 864 F.3d 63, 69-76 (2d Cir. 2017) ("*Allen*"). The principal focus of the investigations was interest-rate derivatives, financial instruments that derive their value from changes or disparities in interest rates. Connolly and Black were charged with conspiring with others to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349, along with several substantive counts of wire fraud in violation of 18 U.S.C. § 1343, by inducing co-workers to submit to the British Bankers' Association ("BBA") false statements that could influence LIBOR rates, in order to increase their employer's profits--or decrease its losses--on existing derivatives contracts.

The government's evidence at the four-and-a-half week trial included expert testimony from economist Dr. Thomas Youle; testimony from James King, Timothy Parietti, and Michael Curtler, alleged coconspirators who had entered into cooperation agreements with the government; and documentary evidence in the form of emails, Bloomberg chats, and telephone calls among the alleged coconspirators. Taken in the light most favorable to the government, *see Evans v. United States*, 504 U.S. 255, 257 (1992), the evidence included the following.

A. *LIBOR and the Financial Industry*

LIBOR is an interest rate benchmark published daily by the BBA for loans of various durations (called loan "tenors")--typically ranging from overnight to one year--in each of the world's major currencies. LIBOR is meant to reflect, on a given day, the rates at which one bank can borrow money from other banks. As explained by Dr. Youle (*see* Trial Transcript ("Tr.") at 126-29), one of the primary purposes served by LIBOR in modern markets is to provide a reference interest rate that financial instruments can incorporate to establish the terms of agreement.

Dr. Youle explained the meanings of certain terms commonly used by bankers and described the workings of a derivative called an interest rate swap. Such a contract normally involves a "notional amount" of principal--i.e., a principal sum that does not actually change hands but that establishes the monetary amount on which interest would be calculated. In some swaps, for example, for the tenor in question one party agrees to pay a set rate of interest; the counterparty agrees to pay a floating rate linked to a stated point of reference. Where LIBOR is the reference point for the floating rate, the party that agrees to pay the LIBOR-related rate is essentially betting that LIBOR will go down, with the counterparty agreeing to pay the set rate and betting that LIBOR will go up. (*See* Tr. 136.) The party that has lost

as of the end date of the tenor (or as of such interim or extended dates as the parties might agree) pays the other party the difference between the two interest rates, multiplied by the notional principal amount.

Differences between the interest rates agreed to in such derivatives may be quite small. They are commonly referred to in terms of "basis points," a basis point being "one one-hundredth of one percent." (*Id*. at 126.) But as Dr. Youle testified, "if the notion[al amount of principal] is really, really big, th[e] payment will be big." (*Id*. at 133.) Thus, with respect to such instruments referencing LIBOR, alteration of the LIBOR level can affect which party owes the other and/or the size of the payment. *See also Allen*, 864 F.3d at 69 n.10 ("'LIBOR serves as the primary reference rate for short-term floating rate financial contracts like swaps and futures. . . . [E]stimates placed the value of such contracts at upwards of $300 trillion.'" (quoting a New York Federal Reserve staff report)).

1. *The BBA's Instructions for LIBOR Submissions*

In order to arrive at a fixed LIBOR rate each day for the various loan tenors of each currency, the BBA relied on information contributed individually by selected banks that were active in the interbank market for that currency (a "LIBOR

panel"). Under the heading "The BBA Libor fixing - definition," the BBA gave instructions to contributor banks with respect to their submissions as to rates ("BBA LIBOR Instruction"). The BBA LIBOR Instruction that was in effect in 2004-2011, introduced at trial as Government Exhibit ("GX") 1-803, is reproduced in full in the Appendix to this opinion.

During the relevant period, the LIBOR panel with regard to United States currency comprised 16 banks. In the BBA LIBOR Instruction, the "Instructions to BBA Libor Contributor Banks" stated that on each business day, between 11:00 and 11:10 a.m., London time, each panel bank--with respect to each of 15 loan tenors--was to submit for that panel's currency

> *the rate* at which it *could borrow funds*, were it to do so *by asking for*
> and *then accepting* inter-bank offers *in reasonable market size* just
> prior to 1100

(GX 1-803 (BBA LIBOR Instruction at 2, ¶ A (emphases added))). Dr. Youle testified that in this BBA LIBOR Instruction, "'rate'" referred to the "interest rate"; "'funds'" referred to "cash"; offers in "'reasonable market size,'" referred to the "typical amount of borrowing" the bank would do, rather than to an "exact[] amount"; and the phrase "'were it to do so by asking for and then accepting'" called for an answer that was

"hypothetical," not for information as to what, on that business day, "the bank actually did." (Tr. 139-40.)

2. *The Process Used To Calculate LIBOR*

The process the BBA used to arrive at each U.S. dollar LIBOR fixed rate was as follows. Thomson Reuters, a data analytics company acting as the BBA's agent, received the 16 panel banks' rate submissions and eliminated from consideration, for each tenor, the four highest and the four lowest. The arithmetic average of the middle eight submitted rates--referred to as the "trimmed mean" (Tr. 171)--constituted the LIBOR daily "fix" (*id*. at 165) for that tenor. (*See id*. at 146-49; GX 1-452, at 26.) The LIBOR fixes were then published by Thomson Reuters each day and transmitted by wire globally.

B. *Deutsche Bank and the Defendants*

During the period 2004-2011, the LIBOR panel for United States currency included Deutsche Bank AG ("Deutsche Bank" or "DB"). Thus, shortly after 11 a.m. on each business day in London, DB, in accordance with the BBA LIBOR Instruction,

was to make for each tenor a submission as to the rate at which DB could borrow cash in the interbank market.

Connolly was employed by DB in its New York City office. From at least 2005 until March 2008, he was director of the "Pool Trading Desk," *i.e.*, DB's combined cash and money market derivatives desk. In that capacity he supervised several derivatives traders, including Parietti. Connolly's principal responsibilities, however, were "fund[ing] the bank" and "running the cash desk." (Tr. 1207.)

Black, from approximately 1997 until 2015, was employed in DB's London office. During the period of the alleged conspiracy, he was a director of that office's Money Market Derivatives and Pool Trading Desks, and his principal responsibility was to trade U.S. dollar money market derivatives. Black was also a "market maker," which had the practical effect that, within DB, "anyone who wanted to trade an interest rate swap or a U.S. dollar derivative would go to Gavin Black and ask for the price in that particular swap." (*Id*. at 288.) Because Black traded in financial products that were tied to LIBOR, his success was to some extent dependent on his ability to predict the movement of LIBOR. (*See, e.g., id*. at 1295-96.)

Neither Connolly nor Black had responsibility for making DB's LIBOR submissions to the BBA. That job fell largely to London office employees Curtler and

- 11 -

King. From 2003 to 2012, King's responsibilities included working on the U.S. dollar money market trading desk and on the cash desk, borrowing money in the interbank market in order to fund DB's cash needs. Throughout his tenure at DB, King was supervised by Curtler, who, during the period relevant to this case, also supervised Black.

Curtler had a series of positions at DB. From about 2000, he too worked on the U.S. currency cash desk, trading dollars to secure funding for the bank. In 2005-2010, his principal responsibility was running the cash desk. He also traded derivatives--principally futures, options, and swaps products--that were tied to LIBOR (*see* Tr. 1606-07), and was one of DB's "largest U.S. dollar derivatives traders" (*id*. 558-59; *see id*. at 1849). King likewise traded derivatives that were tied to LIBOR, and he was actively encouraged by Curtler to engage in such trading. (*See id*. at 557-58.)

King served as the principal submitter of DB's U.S. dollar LIBOR rates to the BBA. When King was unavailable, Curtler was the most frequent "backup submitter" of those LIBOR rates. (*Id*. at 388.)

### 1. *DB's Usual LIBOR Submission Process*

King, who had received a non-prosecution agreement in exchange for his cooperation, testified as to the process by which he and his boss Curtler normally arrived at the LIBOR rates DB would submit to the BBA.  King, as the person responsible for ensuring that DB always had sufficient cash to fund its operations, was in charge of borrowing cash from the interbank market and lending that money to DB's other units--referred to as "DBQ" (Tr. 569, 774).

With respect to such internal loans, DBQ and the cash desk engaged in a bid-and-offer process, with DBQ asking to borrow at a proposed interest rate, and the cash desk offering the loan at a higher rate, typically "about 4 basis points" above the DBQ bid.  (*Id*. at 782.)  In determining the rate of interest at which the cash desk would lend the U.S. dollars that DBQ needed to fund their operations (*see, e.g., id*. at 566), King used, *inter alia*, a spreadsheet that he and Curtler referred to as a "pricer" (*see id*. at 271, 781, 1902).  The pricer "had a live data feed to the market" and therefore was "automatically updated as the market data changed."  (*Id*. at 567.)  The primary function of the pricer was to help King determine the rates at which the cash desk would lend money to DBQ.  (*See id*. at 566.)

King testified that other DB units had their own pricing tools, which in fact were more sophisticated than the one he used, because the derivatives traders needed to be able to make accurate interest-rate predictions in order for their DB transactions to be profitable. (*See*, *e.g.*, *id*. at 574-76; *see also id*. at 1899 ("every trader . . . had their own pricer"); *id*. at 567 ("most of" King's pricer's "market data used for the rates came from the derivatives market").) In addition, the cash desk "had to show . . . a live price throughout London hours to everyone in the bank." (*Id*. at 774.) But DBQ units with their own pricers were quite aware of current market conditions; so if those units believed an interest rate the cash desk was offering DBQ was unduly low, DBQ groups would borrow more money than they needed; and if they believed the cash desk was offering a rate that was unduly high, DBQ would deposit money with the cash desk to earn that rate. (*See id*.)

Accordingly, the cash desk offers to DBQ needed to be realistic. King and Curtler would begin their day at 7 a.m. by noting the previous day's LIBOR rates and checking their respective pricers. Although King testified that he and Curtler used the same pricer (*see id*. at 520), Curtler testified that he and King each had his own pricer, and that while similar, they were not identical (*see*, *e.g.*, *id*. at 1899-1900).

- 14 -

Curtler said his pricer "didn't work exactly the same as Mr. King's pricer," and that they "didn't have a standard pricer that had to be used." (*Id.* at 1900.)

While the pricers automatically changed every day during the day with incoming market data (*see* Tr. 430, 567), King and Curtler also proceeded to manually "put in various factors," "based on various things," and "added in various spreads *to reach the cash prices* that we--*that we wanted to use internally*" because "we had to make sure that the prices that we were showing on the spreadsheet were actual cash prices" (*id.* at 784, 568 (emphasis added)).

King testified that "for a long time" the cash desk's offering rates to DBQ were used as DB's LIBOR submission of the rates at which DB could borrow in the interbank market. (Tr. 782; *see id.* at 569 ("for a time . . . the LIBOR rate in the system was linked to . . . the offered rate within our internal price"); *id.* at 570 ("the LIBOR and price were calculated using the internal rate, . . . [*i.e.,*] the DBQ rate, plus a spread"); *id.* at 782-83 ("we used the offered rates [to] DBQ for our LIBOR submissions").) Thus, the spreadsheet contained a column headed "LIBOR" to show what that day's DB LIBOR submissions would be. (*See id.* at 272-73, 566; GX 1-402A.)

However, because the cash desk's offers to DBQ "had to be accurate" (*id.* at 785), King and Curtler were repeatedly "manual[ly]" "changing" items and "spreads

in the pricer" (*id*. at 568-69, 786); and since the LIBOR column was a function of DB's internal offered rate to DBQ, King's "manual change[s]" to arrive at "the internal rates" also changed "[DB's] LIBOR submission rates" (*id*. at 568-69).

In addition, there were manual changes directed solely at the rate to be submitted for LIBOR. Asked how he made changes to LIBOR submissions "when . . . requests" were received from DB's derivatives "traders" (Tr. 294), King testified that

> as part of the morning process, we would put in all the different factors into what every LIBOR submission should be. And then *that produced the column . . . head[ed] "LIBOR." And then* I would *manually change the rate in or on the spreadsheet itself,* so put in sort of a plus or minus to make the change within the spreadsheets.

(*Id*. at 295 (emphases added).) King testified that he also "added these spreads manually even on days when [he] didn't get a communication from one of the derivatives traders." (*Id*. at 568.) As described hereafter and in Part II.B.2. below, the LIBOR rates were thus not based entirely on market data and were not automatically generated.

In addition to the above alterations in the pricer, King each day consulted, *inter alia*, five interbank cash brokers before settling on DB's LIBOR submissions. (*See* Tr. 571-74.) He testified that it was logical to "change the [LIBOR submission] rates . . . so that they lined up with what the brokers were predicting"

because "the brokers have access to all the banks, they know where we can borrow money or they think they know where we can borrow money." (*Id*. at 571-72.) But King said that while sometimes the rates the brokers were suggesting were all similar, "there [we]re periods when the rates are vastly different"; and then "[we] have to come up with something that we feel is a fair reflection of our rate" (*id*. at 571). Thus, in submitting LIBOR rates, "some days [King] went with the pricer, some days [he] went with the broker, [and] some days [he] went with the middle." (*Id*. at 573.) King testified that he believed that the reference to "reasonable market size" in the BBA LIBOR Instruction--a term the BBA did not define--"gave [him] flexibility as to where [he] could actually submit his LIBOR." (*Id*. at 667.)

The above kinds of manual changes to the figures produced by the pricer were routinely made by King and Curtler to arrive at DB's LIBOR submissions with or without any requests having been made by DB derivatives traders for alterations of the LIBOR submissions. (*See id*. at 568.)

2. *DB Derivatives Traders' LIBOR-Submission Requests*

King and Curtler testified that they sometimes received requests from Connolly or Black to make LIBOR submissions that would be beneficial to DB

derivatives traders' positions, *i.e.*, "trader-influenced" LIBOR submissions. King testified that "Gavin Black occasionally asked me to manipulate the rates or to put in a submission that was higher or lower than I would have done *to benefit his trading position*," and that "Matthew Connolly on occasion made requests for me to change our LIBOR rates and *to benefit the trader's position*." (Tr. 289, 293 (emphases added).)

Curtler testified about a November 2005 email exchange with Connolly concerning a 1-month LIBOR (*see id*. at 1636-46), in which Connolly said "WE WOULD PREFER IT HIGHER...WE HAVE ABOUT 15 BB 1MO RECEIVES" (GX 1-026), meaning that DB's New York derivatives traders (supervised by Connolly) expected to receive payments on notional amounts totaling some $15 billion. Curtler, who apparently had estimated that DB's LIBOR submission for that tenor was "looking like 29" (GX 1-028)--*i.e.*, 4.29 percent--accommodated Connolly's request by submitting a rate of 4.295 percent rather than 4.29 percent and informed Connolly "we went in 295 for u" (GX 1-028). DB's 4.295 percent rate was one of the middle eight panel bank submissions; each of the other seven middle submissions was 4.29 percent. Thus, the trimmed middle constituting the 1-month LIBOR fix was 4.29063 percent, instead of 4.29 percent as it would have been if DB's submission had been 4.29 rather than 4.295. (*See* GX 1-455, at 10.)

The government also introduced other emails and electronic messages to DB's LIBOR submitters requesting modifications of the LIBOR submissions in order to benefit DB's existing trading positions. They included one from Black on May 15, 2008, requesting a low 1-month LIBOR rate because he was "paying on 18 [billion]" (GX 6-001); another from Black on February 21, 2005, requesting a high 6-month LIBOR rate (*see* GX 1-003); one from Connolly on November 23, 2005, requesting that 3-month LIBOR "be as high as possible" (GX 1-024); and an August 12, 2007 email from Connolly stating, "[i]f possible, we need in NY 1mo libor as low as possible next few days....tons of pays coming up overall" (GX 2-001). As a result of this last request, King's DB submission to LIBOR on August 13 was the lowest by any panel bank; and the DB submission on August 15 was four basis points below his estimate of what LIBOR would be. (*See* GX 1-455, at 23; GX 2-002.)

Parietti was a DB derivatives trader supervised by Connolly. He testified that Connolly had instructed him that if "[y]ou have a big position fix into LIBOR," you should "[s]end an email to the cash guys in London, let them know which way around and how much you have, and then just let them do whatever they do." (Tr. 1047.) Curtler testified that when he and King received such requests, he would expect King to take them into account (*see, e.g., id.* at 1626), "[b]ecause that's what we

did" (*id*. at 1618). They would typically adjust the LIBOR submission by half a basis point. (*See id*. at 1616, 1646.)

King described the process by which he attempted to accommodate the traders' requests for higher or lower LIBOR submissions. In the pricer, he would focus on the relevant tenor in the LIBOR column; if the trader's request was for a higher LIBOR submission he would "click on that cell in the spreadsheet and then put in a plus and then . . . change that rate manually to make it higher than the pricer was . . . otherwise telling [him]." (Tr. 428.) King could put in an adjustment formula, which would automatically accommodate the trader's requested alteration, regardless of whether "the market moved up or down." (*Id*. at 431.) However, King also testified that on days when he received a request from a derivatives trader, he "still looked at the pricer estimates," he "still looked at the broker's suggestions," and he "still looked at what[ wa]s going on in the market," because "before deciding what to do," he "had to figure out what was reasonable." (*Id*. at 582.)

Curtler testified that he made LIBOR submissions that benefited his own DB trading positions: "[I]f we came up with a U.S. dollar LIBOR submission for that day and my position required the rate to be higher, we'd skew it to the upside, and the opposite if we wanted it low." (Tr. 1608.) By "we" Curtler included himself, King,

Black, and other derivatives traders in DB's London and New York offices. (*Id*. at 1608-09.) Curtler acknowledged that "there were days where there would have been a wide range of offered rates." (*Id*. at 2135.) He testified, however, that they were not supposed to submit self-interested LIBOR submissions because it "would give us an unfair advantage in the market." (*Id*. at 1608-09; *but see id*. at 1875-76 (DB "didn't have any LIBOR-specific written policies," and provided "no training" to LIBOR submitters and "no . . . checklist that said . . . . [t]hese are the steps you have to go through to make your submission").)

All three cooperators testified that they "knew" the practice of altering DB's LIBOR submissions to benefit DB trader positions was "wrong" at the time they engaged in it. (*E.g.*, Tr. 278 (King); *id*. at 1009 (Parietti); *id*. at 1788 (Curtler).) King stated that "[i]t's intuitively wrong because we are, you know, as I say, taking advantage of the position. We are benefiting. There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing." (*Id*. at 278.) Parietti testified that "even if [LIBOR is] imprecise, hard to estimate, or vague, . . . it's still wrong to base your submission on your bank's position instead of information about the cash market." (*Id*. at 1377.) All three cooperators testified that they never contemporaneously told anyone that they thought the

practice was wrong.  (*See*, *e.g.*, *id*. at 529 (King); *id*. at 1196 (Parietti); *id*. at 1912 (Curtler)).

C. *The Jury Verdicts and Defendants' Motions for Acquittal*

The jury found Connolly and Black guilty of conspiracy to commit wire and bank fraud (Count One).  Several of the substantive wire fraud counts had been withdrawn or dismissed prior to submission of the case to the jury.  Of the remaining substantive counts against Connolly, the jury found him guilty on Counts Two and Nine, involving wire transmissions dated August 15 and 13, respectively (*see* Tr. 2946), which followed his August 12, 2007 email to King requesting one-month LIBORs as low as possible for the next few days; the jury acquitted him on the remaining counts.  The jury found Black guilty on Count Eleven--the only remaining substantive count against him--on the basis of Thomson Reuters's May 15, 2008 international wire publication of LIBOR rates (*see id*. at 2949), which followed his May 15, 2008 request for a low one-month LIBOR because of his imminently due payment on a notional $18 billion.

Following the jury verdicts, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, both defendants moved for judgments of acquittal, arguing that

the evidence was insufficient to prove, *inter alia*, that the requested LIBOR submissions were false. The district court denied their motions in a comprehensive opinion, *see United States v. Connolly*, 16 Cr. 370, 2019 WL 2125044 (S.D.N.Y. May 2, 2019) ("Rule 29 Opinion").

With regard to falsity, the court found, *inter alia*, that the government's evidence was sufficient to establish that the requests by Connolly and Black to King and Curtler with respect to LIBOR submissions resulted in false submissions principally because "Deutsche Bank had an impartial system--a 'pricer'--for calculating what its LIBOR submission should be," Rule 29 Opinion, 2019 WL 2125044, at *2. The court found that

> *the pricer's LIBOR column would show the rates to be submitted on any given day*. And . . . on some days, the conspirators, including Defendants, caused Deutsche Bank to *submit a number that was not that*. Instead they caused Deutsche Bank to take *its determined LIBOR number* and move it in a direction (higher or lower) that would take more money from their counterparties on trades tied to LIBOR.

*Id*. ("not" is emphasized in original; other emphases added).

The court stated that "the question for the jury was whether Defendants made LIBOR submissions that reflected something other than honestly held estimates

- 23 -

of the rate Deutsche Bank *would* have accepted in order to borrow funds," *id*. at *5 (emphasis added), and that

> the evidence showed that the LIBOR submissions made by, and at the request of, Connolly and his co-conspirators . . . did not reflect *the* amount the bank *would* have accepted in order to borrow funds. The jury could have concluded on that basis that the falsity element was satisfied,

*id*. at *7 (emphases added).

The court stated that "whether Deutsche Bank *could* have borrowed funds at a submitted rate is not dispositive of the falsity of its LIBOR submissions." *Id*. at *4 (emphasis in original). It ruled that the government was not required to prove "that Deutsche Bank *could not* have borrowed funds at a rate submitted to the BBA" in order "to establish the falsity of its LIBOR submissions," and that "[a]s a factual matter, even if Deutsche Bank could have borrowed funds at a submitted rate, that would not prevent the submission from being false and misleading." *Id*. at *3-*4 (emphasis in original). The court stated that even "evidence that Deutsche Bank *could* have borrowed funds at a submitted rate would not have rendered the Defendants' statements truthful." *Id*. at *3 (emphasis in original).

> What matters, and what the evidence showed, is that *Deutsche Bank determined what its LIBOR submissions should be*, whereupon Defendants and others caused the bank to change the numbers to

suit their private purposes. A jury could reasonably find that those submissions were fraudulent.

*Id*. at \*4 (emphasis added); *see id*. at \*5 ("Defendants asked Deutsche Bank submitters to change the bank's submissions in line with their trading positions"; hence "the bank's LIBOR submissions were not a true estimate of borrowing costs, but rather numbers manipulated for its financial gain"; "[t]he evidence thus showed Deutsche Bank's LIBOR submissions were false and fraudulent statements because they did not actually reflect the conspirators' estimates of the bank's borrowing costs.")

The court also found that the government had presented sufficient evidence that DB's LIBOR submissions were

fraudulent because each submission carried with it the implicit certification that it was determined according to the BBA's rules-- which is not what happened. . . . By making LIBOR submissions in response to the BBA's question, the conspirators held Deutsche Bank out as a panel member that participated in the process as directed. . . . These implied statements were false because the numbers that the conspirators caused to be submitted were not calculated according to the prescribed considerations, but were instead numbers that would help Deutsche Bank make money at its counterparties' expense.

*Id*. at \*5. The court added that although it was up to the government to provide evidence "to negate any *reasonable* interpretation of the [BBA LIBOR] instruction that would make Deutsche Bank's submission responsive," *id*. at \*6 (internal quotation

marks omitted (emphasis in district court opinion)), it found that "the co-conspirators and Dr. Youle . . . did just that," with their

> testimony . . . regarding *their* understanding of what the BBA was asking, together with their "intuitive" sense of the wrongfulness of moving Deutsche Bank's LIBOR submissions to suit the bank's trading positions and disadvantage its counterparties,

*id*. (emphasis added). The court stated that the government was not required to call a witness from the BBA to provide evidence as to the BBA's intent or understanding of the BBA LIBOR Instruction, and "was not required to prove that the BBA 'unambiguously prohibited' the Defendants' conduct." *Id*.

In sum, the court concluded that the government had sufficiently proven that defendants made false statements because

> the evidence showed that *Deutsche Bank had a method for determining one particular rate*--not a range of rates--at which it could ask for and accept interbank offers for each currency and tenor, per the BBA's definition[, and] . . . . that Defendants at times changed some of *those rates* to benefit their trades at the expense of their counterparties.

*Id*. (emphases added).

Defendants were sentenced as indicated above. These appeals and cross-appeals followed.

## II. DISCUSSION

On appeal, defendants contend principally that the government failed to prove that their requests to King and Curtler with respect to LIBOR resulted in submissions by DB that were false, or were material, or made with fraudulent intent, within the scope of § 1343's prohibition of wire fraud, and that accordingly their convictions on the substantive § 1343 counts and on the count of conspiracy to commit wire fraud and bank fraud must be reversed. Defendants also contend that the government violated their rights to due process by prosecuting them for conduct that was not unambiguously prohibited; and that, in any event, the prosecution was barred by the applicable statute of limitations.

The government has cross-appealed to challenge defendants' sentences. As to the appeals, the government argues principally that the falsity evidence to support defendants' convictions of wire fraud, and of conspiracy to commit wire fraud, was sufficient because the LIBOR submissions were either false statements, or fraudulent omissions because they did not reveal that they had been influenced by trader requests, or misleading half-truths because they impliedly certified that there had in fact been no trader influence. The government agrees that, aside from one

irrelevant exception, defendants' conspiracy convictions must "stand or fall with the substantive wire fraud charges." (Government brief on appeal at 28 n.10.)

We consider defendants' attack on the government's evidence as to falsity under the usual rigorous standard of review. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. In reviewing such a challenge, we view the evidence "in the light most favorable to the Government," *Evans*, 504 U.S. at 257, drawing all inferences and resolving all issues of credibility in favor of the government, *see, e.g.*, *United States v. Weiss*, 930 F.2d 185, 191 (2d Cir.), *cert. denied*, 502 U.S. 842 (1991). We assess the evidence as a whole and "do not evaluate the evidence piecemeal or in isolation." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019). We must affirm the conviction so long as, from the inferences reasonably drawn, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).

Because we conclude, for the reasons that follow, that the evidence was insufficient to prove that defendants caused DB to make LIBOR submissions that were false or deceptive, *i.e.*, to prove that they engaged in conduct that was within the scope of § 1343, we reverse defendants' convictions. We thus need not reach

defendants' other contentions; and the government's cross-appeals as to sentencing are moot.

A. *The Scope of § 1343*

The wire fraud statute that defendants were convicted of violating and conspiring to violate provides in pertinent part as follows:

> Whoever, having devised or intending to devise *any scheme or artifice to defraud*, or for obtaining money or property *by means of false or fraudulent pretenses, representations, or promises*, transmits or causes to be transmitted by means of wire . . . any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (emphases added). Section 1343 uses the same "scheme or artifice to defraud" language that is used in 18 U.S.C. § 1341, which prohibits fraudulent or deceptive use of the mails, and thus the two statutes are analyzed "in the same way." *United States v. Slevin*, 106 F.3d 1086, 1088 (2d Cir. 1996); *see Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005) ("we have construed identical language in the wire and mail fraud statutes *in pari materia*[, s]ee Neder v. *United States*, 527 U.S. 1, 20 (1999) ("'scheme or artifice to defraud'")").

In *Durland v. United States*, 161 U.S. 306 (1896), addressing a mail-fraud predecessor to § 1341, *see* Rev. St. § 5480, *amended by* Act of Mar. 2, 1889, ch. 393, 25 Stat. 873 (1889), the Supreme Court construed the meaning of "any scheme or artifice to defraud" to "include[] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." 161 U.S. at 313. In 1909, "Congress codified the holding of *Durland*" and "added the words 'or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises' after the original phrase 'any scheme or artifice to defraud.'" *McNally v. United States*, 483 U.S. 350, 357 (1987) (addressing § 1341).

In 1924, the Court stated that "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id*. at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (addressing the predecessor of 18 U.S.C. § 371, which makes criminal any conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose")). In *Neder*, the Court ruled that, to come within the federal fraud statutes, *a "scheme to defraud" must have employed a falsehood* that was "material." 527 U.S. at 20 (emphasis added).

As the government notes, "[s]chemes to defraud are often characterized by false statements. A false statement requires, of course, a 'statement,' which the Supreme Court has characterized as an assertion of fact capable of confirmation or contradiction. *Williams v. United States*, 458 U.S. 279, 284 (1982) (construing 'false statement' under 18 U.S.C. § 1014 [statements to influence certain banks or other financial institutions]" (Government brief on appeal at 31). To convict an accused of a wire fraud "scheme to defraud," however, the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth, *i.e.*, a "representation stating the truth so far as it goes" but is nonetheless misleading because of the "failure to state additional or qualifying matter," *Restatement (Second) of Torts* § 529 (1977). For example, where Canada's laws "heavily taxed the importation of alcoholic beverages," *Pasquantino v. United States*, 544 U.S. 349, 353 (2005), the defendants by their

> routine[] conceal[ment of] imported liquor from Canadian officials and fail[ure] to declare those goods on customs forms . . . . represented to Canadian customs officials that their drivers had no goods to declare. This, then, was a scheme "designed to defraud by representations," *Durland*[, 161 U.S. at] 313 . . . and therefore a [wire fraud] "scheme or artifice to defraud" Canada of taxes due on the smuggled goods,

*Pasquantino*, 544 U.S. at 357.

But these federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices. In *Williams*, the Supreme Court reversed convictions under § 1014 for false statements to banks, ruling--despite emphasis by the government and the dissent that the defendant's check-kiting conduct was wrongful--that that conduct was not within § 1014's prohibition against the making of a false statement, *see* 458 U.S. at 287 & n.8; *see also id*. at 284 ("technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'"). In *Fasulo v. United States*, 272 U.S. 620 (1926), the Court noted that a mail fraud prosecution is not warranted by the mere fact that the defendant's conduct was improper, objectionable, or even despicable. "[T]he obtaining of money by threats to injur[e] or kill is more reprehensible than [by] cheat, trick or false pretenses; but that is not enough to require the court to hold that a scheme based on such threats is one to defraud," *id*. at 628. Thus, the *McNally* Court noted that "[a]s the Court said in a mail fraud case years ago: 'There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute.'" 483 U.S. at 360 (quoting *Fasulo*, 272 U.S. at 629).

B. *The Government's Evidence as to Fraud, Falsity, or Deception*

In the present case, in order to determine whether LIBOR submissions by King or Curtler that were affected by requests of Connolly or Black--undisputedly requests in aid of derivatives contracts held by them or by traders they supervised--constituted statements that were false, half-truths, or fraudulent omissions, we must begin by examining the BBA LIBOR Instruction with which the LIBOR submitters were to comply. We look principally to the language of the BBA LIBOR Instruction, to any accompanying elaboration or explanations of the BBA LIBOR Instruction, and to the government's evidence as to how DB's submitters arrived at their LIBOR submissions that were not trader-influenced. As the trial judge instructed the jury, "where, as here a[n alleged] scheme to defraud *is premised on an instruction--in this case from the BBA to the submitting bank*--the government has the burden to *negate any reasonable interpretation of the instruction* that would make Deutsche Bank's submission responsive" (Tr. 2895 (emphases added); *see also id*. at 2887 ("the government contends that such submissions were *not an honest response to the instruction* that the 16 LIBOR submitters were supposed to give to the BBA" (emphasis added)).

1. *The BBA LIBOR Instruction: A Series of Hypotheticals*

During the period at issue in this case, the BBA LIBOR Instruction directed each panel bank to state, as to each tenor of the currency at issue,

> the rate at which it *could* borrow funds, *were it to do so* by asking for *and then accepting* inter-bank *offers* in *reasonable market size* just prior to 1100.

(GX 1-803 (BBA LIBOR Instruction at 2, ¶ A (emphases added)).) As Dr. Youle testified, "rate" referred to interest rate, and "funds" referred to cash. (Tr. 139.) The term "reasonable market size" was one that the BBA had not defined. Dr. Youle interpreted it as referring to the "typical amount of borrowing" the bank "would" do. (*Id*. at 140.) The BBA stated that it had "intentional[ly]" declined to provide a definition, stating that "reasonable market size will vary according to prevailing liquidity and credit conditions as well as between currencies and even quoting banks," and that "it would appear that reasonable market size is a concept that is understood by all market participants." (Defense Exhibit ("DX") 1171A, ¶ 12.3).

The BBA LIBOR Instruction did not ask about an actual loan. Rather, it asked a question that was "hypothetical." (*E.g.*, Tr. 139, 213-14.) A panel bank was to "estimat[e]" (*id*. at 139) the interest rate at which the bank "could" (GX 1-803 (BBA LIBOR Instruction at 2, ¶ A)) borrow an amount of cash that it would typically

- 34 -

borrow, "were it to do so by asking for and then accepting" inter-bank offers in London just before 11 a.m. (*id*.; *see* Tr. 139-40; *see also id*. at 174-75 ("[b]ecause of that word 'could,' this instruction is asking for a hypothetical rate," "[i]t's asking for the panel banks to make an estimate")).

The district court, in denying defendants' Rule 29 motions for acquittal on the ground of lack of proof that any LIBOR submissions were false, stated that the government had no obligation to present evidence showing that DB "*could not* have borrowed funds at [the] rate[s it] submitted" after receiving a request for higher or lower rate submissions by derivatives traders. Rule 29 Opinion, 2019 WL 2125044, at *3 (emphasis in original). And in the district court's view, evidence that DB Bank "*could* have borrowed funds at a submitted rate would not have rendered the Defendants' statements truthful." *Id*. (emphasis in original). We disagree. The precise hypothetical question to which the LIBOR submitters were responding was at what interest rate "could" DB borrow a typical amount of cash if it were to seek interbank offers and were to accept. If the rate submitted is one that the bank could request, be offered, and accept, the submission, irrespective of its motivation, would not be false.

Defendants, of course, had no burden to produce any evidence. The burden was on the government to provide evidence to show that the LIBOR submissions made by King or Curtler after receiving requests from Connolly or Black were untrue. At the trial of these defendants, the government's three cooperating witnesses--King and Curtler who were LIBOR submitters, and Parietti who requested LIBOR submissions that would favor his existing derivatives trades--testified that they knew it was "wrong" (Tr. 278, 1009, 1788), "intuitively wrong" (*id*. at 278), for LIBOR submissions to take into account the DB derivatives traders' existing positions. And the district court found it significant that "[a]ll three co-conspirator witnesses testified that they understood this conduct was 'wrong' because it would give Deutsche Bank an unfair advantage over its trading counterparties." Rule 29 Opinion, 2019 WL 2125044, at *3. Yet none of the witnesses testified that DB could not have borrowed a typical amount of cash at the rate stated in any of DB's LIBOR submissions. And contrary to the district court's Rule 29 Opinion, whether DB "could" do so was the precise question to which the LIBOR submissions were to respond, and was thus the key to whether a given submission was false.

Instead of producing evidence that DB could not borrow at the interest rates stated in the trader-influenced LIBOR submissions, the government relied on

the theory--adopted by the district court--(a) that on each day, for each loan tenor, there was only one true interest rate that DB could submit, (b) that that rate was generated automatically by King's pricer, and (c) that that one true automatically generated rate was in fact what DB submitted except when King or Curtler received a request for a higher or lower number from Connolly or Black.  Thus, Dr. Youle, the government's expert, testified that "there was always an understanding that the[ panel banks] would submit *the one* best estimate of *the true borrowing costs they had*."  (Tr. 226 (emphases added).)  And Curtler testified--in part--that

> we set our LIBORs using a process that we used on the desk to come up with a number.  That number was the Deutsche Bank's submission, and then if we took into account requests for traders, we altered that submission.

(Tr. 2142.)

The government emphasized its one-true-number theory in summation-- "*You borrow at the lowest rate.  There's no range*" (Tr. 2664 (emphasis added))--and emphasized that DB had a "pricer" that generated the one true rate:

> You . . . know, when it comes to the scheme, that *there was a pricer*. Remember that pricer . . . .  You heard from different witnesses about it.  And there might be different versions of it.  This was what was manipulated.  *There was actually a rate sitting on the pricer to submit to LIBOR*.  And what the defendants and their co-conspirators did was that they would, *on days where they had*

- 37 -

*trading positions that would benefit,* they would *take the numbers and they would change them* and they would send them. *So they took what would otherwise have been an honest submission, they changed it, and they dishonestly sent the rates that benefited the trading positions.*

(Tr. 2636 (emphases added); *see also id*. at 2852 ("James King and Mike Curtler told you that they had a starting number. And they used the pricer, they used market factors. *They had a starting number*. And *they took that number*, and *when they had a request, they moved it*, pure and simple. That is false and it is misleading." (emphases added)).)

[I]n this case *the submitters actually had a number sitting right there on that pricer, and that's the number they would send*. It was a number. *And that's what they moved and changed dishonestly when they sent it to benefit the trading positions*.

(*Id*. at 2664 (emphases added).)

As indicated in Part I.C. above, the district court concluded that the jury was entitled to accept the government's proposition that DB had "an impartial . . . 'pricer'" that automatically "calculat[ed] what [DB's] LIBOR submission should be." Rule 29 Opinion, 2019 WL 2125044, at *2. It concluded that the government had thus sufficiently proved that on days as to which King and Curtler received requests from or on behalf of derivatives traders, the number submitted in the LIBOR submissions

"was *not* that" generated by the pricer, and thus the number submitted was false. *Id.* (emphasis in original).

There are two principal respects in which the trial evidence, viewed as a whole, fails to support the foundations of the government's theory of falsity, *i.e.*, that there was (a) one true interest rate, (b) automatically generated by the pricer, (c) which was DB's LIBOR submission as generated except when there was a request from a trader. First, the testimony of the government's witnesses revealed that there were many factors other than the data automatically received by the pricer that informed DB's final LIBOR submission. Second, there were many loans available to DB, with varying interest rates; and as DB could agree to such rates, there was no one true rate that it was required to submit.

2. *Multiple Objectives, and Manual Inputs to the Pricer*

DB's LIBOR submissions were not automatically generated by a pricer. Preliminarily, we note that DB did not have just one single pricer. (*See* Tr. 1899.) In addition, the fact that "every trader" at DB "had their own pricer" (*id*.)--and that the derivatives traders' pricers were more sophisticated than King's pricer (*see id.* at 574-75)--was significant because the primary use of King's pricer in fact was not to

calculate LIBOR submissions; King testified that "the main purpose of the pricer was to determine th[e] internal interest rates" for DBQ (*id*. at 566). The rate at which the cash desk lent money to DBQ was normally about four basis points over the DBQ bid. And that number for the cash desk's loans to DBQ, *i.e.*, four basis points above the DBQ bid, was often DB's LIBOR submissions. (*See id*. at 782.)

But there was no evidence that these starting points for DB's estimate of its borrowing costs--*i.e.*, the DBQ bids--were generated by the pricer; those bids were internal information, submitted to the cash desk by DB's other units. Rather, the record shows that DBQ bids were entered into the pricer manually; and as to such actual DBQ bids, DB's responding offers were also not pricer-generated. The government introduced a screen-shot of King's pricer, GX 1-402A, as "an example of what would be contained on [his] pricer." (Tr. 272.) While King gave little explanation of the document other than to say that he sent the rates shown in a column headed "LIBOR" to Thomson Reuters (*see id*. at 273), the exhibit itself revealed that the document was not limited to data automatically generated by the pricer. In a column headed "DBQ BID," there are several entries colored blue. Near the bottom of the document are endnotes, one of which states that "CELLS NEEDING *MANUAL INPUT* ARE IN BLUE." (GX 1-402A (emphasis added).) And in the DBQ BID-

- 40 -

adjacent column headed "DBQ OFFER," each DB offer opposite a manually entered DBQ Bid is exactly four basis points above the DBQ Bid; and each of those offer numbers is in blue.

There are also other columns in GX 1-402A with all entries in blue (including one headed simply "Manual"). And other endnotes include instructions as to certain items that "NEED[] TO BE INPUT MANUALLY," and as to the proper placement of "MANUAL OVERRIDES." (*Id*.)

Further, without necessarily referring to GX 1-402A, King testified that there were various other data that he and Curtler obtained and manually added to the (supposedly automatic) pricer. (*See* Tr. 568-69.) They inserted prices and adjusted formulas in the pricer and "from 2003 to 2012" "the spreadsheet changed," "various things changed." (Tr. 570.) Thus, Curtler, when asked whether he "used [his] pricer" to "c[o]me up with [an] unmanipulated number" for the LIBOR submission, responded "we did use the pricer *to help* come up with that number." (Tr. 2142-43 (emphasis added); *see also id*. at 759 (King testifying that his LIBOR number "was *a number that* our pricer came up with or that we--*we came up* with to get a single number, which was a number for us that we would submit in any particular tenor" (emphases added)).)

Curtler testified, for example, that "the kinds of . . . economic factors [he] might look at" to make a decision on a LIBOR submission included "[a]ctual cash trading," "[c]ash levels at other banks," and "[i]nterest rate changes" (Tr. 1896), and that he "might feed into the pricer . . . the price of interest rate futures," *i.e.*, "euro dollar futures" (Tr. 1899). King, in "talking about LIBOR," testified, that he and Curtler were "changing spreads [in the pricer] to get the[m] back in line with the markets." (Tr. 785-86; *see also id*. at 571.) King testified, *inter alia*, that

■ "while you had these inputs, which are live feeds into the spreadsheets, *we added in various spreads to reach the cash prices that we--that we wanted* to use internally"; these were "manual change[s] that [King] made to the internal rates to get to [his] LIBOR submission" and he "*added these spreads manually even on days when [he] didn't get a communication from one of the derivatives traders*" (Tr. 568 (emphases added));

■ there were "different spreads," "spreads that gave us the DBQ, which are our internal pricer [*sic*]. And then there's the other spread for the LIBOR." "There's a spread on top of the internal rates"; King would "*manually change the internal prices. And* then *if [he] needed to change the LIBORs*, then there would be *a separate adjustment*" (Tr. 569 (emphases added));

■ "you'd borrow money every single day, so that *you* then *had to* put--*find various inputs to establish what that correct rate might be* and those, as I said, inputs are very varied" (Tr. 657 (emphases added));

■ "[i]f--there are various rates, and we're not necessarily trading, different brokers are quoting different prices, then *we have to come up with a number* that we think reflects or where we think our LIBOR should be that day" (Tr. 671 (emphasis added));

■ "[t]here were *various inputs*"; we "*had to use as many inputs as possible* to come up with a number we thought was right" (Tr. 694 (emphases added));

■ when asked whether the DBQ plus four basis points "equate[d] to a LIBOR submission without needing to adjust it to the market, because it's based on a derivative feed," King responded "[i]t's based on various things. So we have a derivative feed *and then we put in various factors to create a DBQ cash curve.*" (Tr. 784 (emphasis added)).

Further, King testified that "[t]here were five brokers [he] spoke to on a daily basis," and for some portion of the period in which he managed the cash desk, "if the brokers [we]re saying this is where the cash market is, this is where LIBORs are," he "changed the spread" to get his LIBOR submissions in line with the actual U.S. dollar fixings that the brokers were predicting. (Tr. 571-72.) "On any given day the brokers' predictions could have been the same" or they "could have been different"-- on some days all five brokers and the pricer could have been different. (*Id*. at 572.) King testified that on "some days [he] went with the pricer, some days [he] went with the broker, some days [he] went with the middle." (*Id*. at 573.) And any of those three

outcomes could occur "on a day where [he] had no communication with any person who traded derivatives." (*Id*. at 574.)

### 3. *Multiple Loan Amounts and Multiple Interest Rates*

Most importantly, the one-true-interest-rate theory was also belied by the evidence that loans may have different rates of interest simply because they involve different amounts of principal. King testified that the cash desk would "borrow money every single day" (Tr. 657), and that "[t]here were periods where I need to borrow some $20- to $25 billion a day" (*id*. at 269). He said that "[o]ften it costs you more to borrow more cash than less cash," and thus loans in various principal amounts could be at varying rates of interest. (*Id*. at 667-68.)

Similarly, Curtler testified that "there were *days where there would have been a wide range of offered rates*." (*Id*. at 2135 (emphasis added).) He said that "[i]f two counterparties were willing to lend to you, I believe I would borrow the cheapest money first"; but "[y]ou wouldn't borrow one or the other. *You would borrow both . . . .*" (Tr. 2181 (emphasis added).) And the BBA LIBOR Instruction does not say which of those two prices should be submitted. Curtler testified that he would have told the

FBI "that for LIBOR, there are a range of numbers which could be reasonably used as a correct LIBOR rate." (*Id*. at 1905.)

King likewise testified that where there could be loans of the same tenor but of different sizes, carrying different rates of interest, the BBA LIBOR Instruction provided no guidance as to which interest rate should be submitted, hence giving him leeway as to what rate to submit:

> Q. The BBA's LIBOR definition uses the phrase "reasonable market size"?
>
> A. Yes.
>
> Q. And that term is not defined in the definition, right?
>
> A. That's right.
>
> Q. *And the reasonable market size term gave you flexibility as to where you could actually submit your LIBOR, right?*
>
> A. *Yes.*
>
> Q. *And, for example, if you could borrow cash at 500 million at the same tenor at one price, and you borrow . . . a billion, at another price, the BBA's definition doesn't say which of those two prices you're supposed to use?*
>
> A. *Correct*.
>
> Q. *And those two prices aren't necessarily the same, right?*

A. *That's right*.

(Tr. 667 (emphases added).) These varying rates are rates that DB would "ask[] for and then accept[]" (GX 1-803 (BBA LIBOR Instruction at 2, ¶ A)), as opposed to "inflated interest rate[s]"--hypothesized by the government--at which DB "could" borrow to its obvious detriment (*see* Government brief on appeal at 47).

4. *Efforts To Submit a Feasible Trader-Induced Interest Rate*

It is true, as the government argues, that a scheme need not succeed in order to violate § 1343. *See, e.g., Pasquantino*, 544 U.S. at 371 ("[t]he wire fraud statute punishes the scheme, not its success" (internal quotation marks omitted)). But to come within the scope of § 1343 it must at least be a scheme to defraud. Here, the government failed to show that trader-induced LIBOR submissions did not reflect rates at which DB could have borrowed. If the submissions did reflect rates at which DB could have borrowed, they complied with the BBA LIBOR Instruction, and the LIBOR submissions were not false.

King, who believed that the "'reasonable market size'" term of the BBA LIBOR Instruction "gave [him] flexibility as to where [he] could actually submit [DB's]

LIBOR" (Tr. 667), testified that when he received a request from a trader, he made every effort to see what rate submission by DB would be "reasonable":

> Q. . . . . On days where you received a communication from a derivatives trader regarding LIBOR, you still looked at the pricer estimates, right?
>
> A. Yes.
>
> Q. You still looked at the broker's suggestions?
>
> A. Yes.
>
> Q. You still looked at what's going on in the market?
>
> A. Yes.
>
> Q. The reason you did that is because you had to figure out what was reasonable before deciding what to do; correct?
>
> A. Yes.

(Tr. 582; *see id*. at 583 (King "always tried to put in a rate that was" "within reason," *i.e.*, "reasonable").)

Curtler testified that in response to a derivatives trader request, "we would have moved our LIBOR submission about half a basis point." (Tr. 1646.) Asked why they would move half a basis point rather than 10 basis points, Curtler responded that they wanted the move not to be obvious. (*See id*.) Regardless of the

motive for severely limiting the size of the trader-influenced move--or for making any move at all--the record remains bereft of any evidence that the trader-influenced rates that King and Curtler submitted were rates that DB could not have requested, been offered, and accepted.

For example, in describing the communications that underlay Connolly's conviction for wire fraud on Counts Two and Nine, the government states as follows:

> On August 12, 2007 (Sunday), Connolly emailed King and Curtler, "If possible, we need in NY 1 mo libor as low as possible next few days...tons of pays coming up overall...thanks!" King responded, "Will do our best Matt." Deutsche Bank's 1-month LIBOR submission on August 13, 2007, was 5.550 percent, lower than any other panel bank by five basis points. Three days later, on August 15, King messaged Connolly, "1m libor looking like 57 [5.57 percent] today matt." Connolly replied, "Thanks [King], you are the man!" Deutsche Bank's 1-month LIBOR submission on August 15 was 5.530 percent, lower by four basis points than King's earlier email indicating a likely LIBOR estimate of 5.57 percent.

(Government brief on appeal at 20 (footnotes and internal citations omitted) (ellipses in original) (brackets in government brief).) But the fact that DB's LIBOR rate on the day after Connolly's request was lower than that of any other panel bank did not prove that the submitted rate was not a rate at which DB did not reasonably believe it "could" have borrowed. In fact, according to the government document showing

- 48 -

those LIBOR submissions, the 5.55 percent rate that DB submitted on August 13 was the very same LIBOR rate it had submitted on the preceding business day--a day as to which no evidence was presented of any LIBOR request from a derivatives trader. (*See* GX 1-455, at 23.)

And although DB's submitted LIBOR rate of 5.53 percent on August 15 was lower than its August 13 submission and lower than King had apparently been planning to submit on August 15, the government again points to no evidence to show that DB did not reasonably believe it "could" have borrowed at 5.53 percent. The mere fact that DB's August 15 submission was lower than it had been on August 13 did not carry that implication. Indeed--again according to the government's evidence--every one of the 16 panel banks submitted a lower rate on August 15 than it did on August 13. (*See* GX 1-455, at 23.) We have been pointed to no evidence suggesting, much less proving beyond a reasonable doubt, that the August 13-15 DB LIBOR submissions underlying Connolly's wire fraud convictions were false.

The government's argument that we should uphold the convictions on the theory that trader-influenced submissions constituted statements of "opinion[s] not honestly held" (Government brief on appeal at 32) suffers the same deficiency. While the government's three cooperating witnesses all testified that it was "wrong"

to allow DB's LIBOR submissions to be influenced by existing derivatives trading positions because it gave them an "unfair advantage" over their counterparties (*see*, *e.g.*, Tr. 278 (King), 765 (King), 1167 (Parietti), 1609 (Curtler), 2152 (Curtler)), not one of the witnesses testified that the submissions that were actually made were not rates at which DB "could"--as defined by the BBA LIBOR Instruction--borrow.

Although the government states that the BBA's "instructions did not allow a panel bank, when submitting its honest estimate of its borrowing costs, to consider the submission's effect on the profitability of interest rate swaps or other derivatives positions held by the bank's traders" (Government brief on appeal at 9), in fact the BBA LIBOR Instruction contained no such prohibition. (*See* Appendix to this opinion.) In contrast, the BBA did evince a concern about collusion between panel banks. The BBA LIBOR Instruction expressly stated that "Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks." (GX 1-803 (BBA LIBOR Instruction at 2, ¶ C).) But there was no similar prohibition against banks' making their LIBOR submissions with consideration of the bank's own interest-rate-sensitive derivatives. Dr. Youle testified that LIBOR "was created in the '80s," and LIBOR's use as a reference point in interest-rate-based derivatives contracts became so popular that "trillions and trillions of dollars of

contracts in notional value [have come to] depend on it." (Tr. 128-29.) There can thus be no doubt that the BBA as an industry organization well knew that traders in interest-rate-sensitive derivatives are intently attuned to and concerned about LIBOR. Indeed, the BBA LIBOR Instruction expressly required submitters to use maturity dates calculated in conformity with "the *ISDA* Modified Following Business Day convention" (GX 1-803 (BBA LIBOR Instruction at 2, ¶ E) (emphasis added)). "ISDA stands for International Swaps and Derivatives [A]ssociation." (Tr. 178.)

Nor could a reasonable jury infer from Dr. Youle's testimony that the BBA LIBOR Instruction required DB to submit its "one best estimate" (*id*. at 226; *see* Government brief on appeal at 44-45). While Dr. Youle testified to "an understanding that [banks] would submit the one best estimate of the true borrowing costs they had" (Tr. 226), he did not link that understanding to the BBA LIBOR Instruction, which contains no similar qualification (*see* GX 1-803 (BBA LIBOR Instruction)). Nor did he link that understanding to language in the BBA LIBOR Instruction expressing the expectation that panel banks would "comply with the *spirit* of th[e] Definition or the Instructions to BBA LIBOR Contributor Banks" (*id*. at 1 (emphasis added)). Dr. Youle referred to this "spirit" language only in connection with questions as to whether the BBA LIBOR Instruction "place[d any] restrictions on *which [panel] bank employees . . .*

could serve as a LIBOR setter" (Tr. 182 (emphasis added); *see id.* at 182-86). Responding that the BBA LIBOR Instruction during the relevant period did not contain any such specific restriction (*id.* at 182), Dr. Youle interpreted the "spirit" language as alluding to the BBA's goal of accurately measuring the interbank rate and as evincing a BBA expectation that panel banks would have their submissions made by employees who had a relevant kind and level of experience (*see id.* at 184-86.) As discussed earlier, the government did not present evidence that DB's submissions inaccurately reflected "the rate at which [DB] could borrow funds" (GX 1-803 (BBA LIBOR Instruction at 2, ¶ A)).

Finally, we see no merit in the government's argument that a trader-influenced LIBOR submission constituted a "half-truth[]" on the theory that it carried an "implied certification" that there had in fact been no trader influence on the submission. (Government brief on appeal at 25.) As discussed earlier, the BBA LIBOR Instruction as it existed during the earlier period at issue in this prosecution, while explicitly barring collaboration between panel banks, said nothing to bar a panel bank's LIBOR submitters from receiving or considering input from that bank's employees who were derivatives traders. There being no guidance from the BBA as to int**ra**bank input--especially given an explicit prohibition of int**er**bank input--a

bank's submission of a LIBOR rate did not implicitly represent that there had been no consideration of the panel bank's existing trades.

In 2013, the BBA adopted a "LIBOR Code of Conduct" for "Contributing Banks" limiting the permissible exchange of LIBOR-relevant information between submitters and traders ("BBA 2013 Code"). (*See*, *e.g.*, DX0151 (BBA 2013 Code ¶ 4.8 ("[r]equiring individuals not involved in the LIBOR-setting process . . . [n]ot to contact submitters and reviewers to attempt to influence, or inappropriately inform, the contributing bank's submissions for any reason, including for the benefit of any derivatives trading positions"). But during the earlier period at issue in the present case, there were no such guidelines or prohibitions, and the BBA LIBOR Instruction did not prohibit LIBOR submitters' consideration of traders' positions. (Tr. 185-90.) The government concedes that this prohibition was not issued by BBA until "after the charged conspiracy [had] ended." (Government brief on appeal at 23 n.8.)

In sum, the government sought to prove falsity on the premise that the BBA LIBOR Instruction required DB to submit a particular interest rate, that such a rate was generated automatically by a DB pricer, and that LIBOR submissions that were influenced by requests from DB derivatives traders were false because those submissions were not the numbers automatically generated by the pricer. However,

the government's main fact witnesses at trial, the LIBOR submitters, testified that there were numerous ways in which the pricer did not generate such numbers automatically because those witnesses regularly altered pricer data and spreads manually; that the LIBOR submitters regularly deviated from the pricer output--even as affected by the submitters' manual adjustments--in order to make LIBOR submissions that reflected interest rate estimates they had received from independent brokers; and that the LIBOR submitters engaged in all of these practices even on days when they had no requests from DB derivatives traders.

The government failed to produce any evidence that any DB LIBOR submissions that were influenced by the bank's derivatives traders were not rates at which DB could request, receive offers, and accept loans in DB's typical loan amounts; hence the government failed to show that any of the trader-influenced submissions were false, fraudulent, or misleading. While defendants' efforts to take advantage of DB's position as a LIBOR panel contributor in order to affect the outcome of contracts to which DB had already agreed may have violated any reasonable notion of fairness, the government's failure to prove that the LIBOR submissions did not comply with the BBA LIBOR Instruction and were false or misleading means it failed to prove conduct that was within the scope of the statute prohibiting wire fraud schemes.

Accordingly, we reverse defendants' convictions for wire fraud. Further, given that the government failed to present evidence to show falsity in the trader-influenced submissions, defendants' convictions for conspiracy to commit wire fraud and bank fraud must also be reversed.

C. *Other Contentions*

In light of our conclusion that there was insufficient evidence to support defendants' convictions because of the government's failure to prove falsity, we need not reach defendants' alternative challenges to their convictions.

In light of the reversal of the convictions, the government's cross-appeals challenging defendants' sentences are moot.

CONCLUSION

We have considered all of the government's arguments as to the sufficiency of its evidence to prove the falsity element of the offenses of which defendants were convicted and have found them to be without merit. The judgments

of conviction are reversed and the matter is remanded to the district court for entry of judgments of acquittal.

The government's cross-appeals are dismissed as moot.



Location :   Public Homepage > BBA Libor > BBA Libor Definition > The BBA Libor fixing - definition

**Sections**

BBA Leaflets
BBA Libor
BankFacts
Banking Codes
Business Account Finder
Conferences and seminars
Dormant accounts
News Room
Policy Issues
Publications
Recruitment
Sponsorship
Statistics
Training
Venue Hire
Westminster Watch

**November most viewed pages**

1. Historic BBA Libor rates

2. Review of the Banking Codes 2004 - Recommendations of the Independent Reviewer and initial Response on behalf of subscribers to

3. Future publishing dates for MBBG press releases

4. Bank accounts for students

5. Financial services integration in Europe - the way ahead

**BBA Libor Definition**

Bookmark this page | Email this page | Print View

## The BBA Libor fixing - definition

11/07/2002

BBA LIBOR is the BBA fixing of the London Inter-Bank Offered Rate. It is based on offered inter-bank deposit rates contributed in accordance with the Instructions to BBA LIBOR Contributor Banks.

The BBA will fix BBA LIBOR and its decision shall be final. The BBA consults on the BBA LIBOR rate fixing process with the BBA LIBOR Steering Group. The BBA LIBOR Steering Group comprises leading market practitioners active in the inter-bank money markets in London.

BBA LIBOR is fixed on behalf of the BBA by the Designated Distributor and the rates made available simultaneously via a number of different information providers.

Contributor Panels shall comprise at least 8 Contributor Banks. Contributor Panels will broadly reflect the balance of activity in the inter-bank deposit market. Individual Contributor Banks are selected by the BBA?s FX & Money Markets Advisory Panel after private nomination and discussions with the Steering Group, on the basis of reputation, scale of activity in the London market and perceived expertise in the currency concerned, and giving due consideration to credit standing.

The BBA, in consultation with the BBA LIBOR Steering Group, will review the composition of the Contributor Panels at least annually.

Contributed rates will be ranked in order and only the middle two quartiles averaged arithmetically. Such average rate will be the BBA LIBOR Fixing for that particular currency, maturity and fixing date. Individual Contributor Panel Bank rates will be released shortly after publication of the average rate.

The BBA, in consultation with the BBA LIBOR Steering Group, will review the BBA LIBOR Fixing process from time to time and may alter the calculation methodology after due consideration and proper notification of the planned changes.

In the event that it is not possible to conduct the BBA LIBOR Fixing in the usual way, the BBA, in consultation with Contributor Banks, the BBA LIBOR Steering Group and other market practitioners, will use its best efforts to set a substitute rate. This will be the BBA LIBOR Fixing for the currency, maturity and fixing date in question. Such substitute fixing will be communicated to the market in a timely fashion.

If an individual Contributor Bank ceases to comply with the spirit of this Definition or the Instructions to BBA LIBOR Contributor Banks, the BBA, in consultation with the BBA LIBOR Steering Group, may issue a warning requiring the Contributor Bank to remedy the situation or, at its sole discretion, exclude the Bank from the Contributor Panel.

If an individual Contributor Bank ceases to qualify for Panel membership the BBA, in consultation with the BBA LIBOR Steering Group, will select a replacement as soon as possible and communicate the substitution to the market in a timely

**Other Links**



GOVERNMENT
EXHIBIT
**1-803**
1:16-cr-00370-CM

fashion.

### Instructions To BBA Libor Contributor Banks

A. An individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100.
B. Rates shall be contributed for currencies, maturities and fixing dates and according to agreed quotation conventions.
C. Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks.
D. Rates shall be for deposits:
   - made in the London market in reasonable market size;
   - that are simple and unsecured;
   - governed by the laws of England and Wales;
   - where the parties are subject to the jurisdiction of the courts of England and Wales.
E. Maturity dates for the deposits shall be subject to the ISDA Modified Following Business Day convention, which states that if the maturity date of a deposit falls on a day that is not a Business Day the maturity date shall be the first following day that is a Business Day, unless that day falls in the next calendar month, in which case the maturity date will be the first preceding day that is a Business Day.

F. Rates shall be contributed in decimal to at least two decimal places but no more than five.
G. Contributors Banks will input their rates to the Designated Distributor between 1100hrs and 1110hrs, London time.

The Designated Distributor will endeavour to identify and arrange for the correction of manifest errors in rates input by individual Contributor Banks prior to 1130.

The Designated Distributor will publish the average rate and individual Contributor Banks' rates at or around 1130hrs London time.

Remaining manifest errors may be corrected over the next 30 minutes. The Designated Distributor then will make any necessary adjustments to the average rate and publish it as the BBA LIBOR Fixing at 1200hrs.

to top



BBA Credit Derivatives Report 2003/2004
*Order your copy now!*

**Click for more info**

**Home | About BBA | Contact us | Privacy policy | Terms and conditions | FAQs | Useful links**

© 1996-2004 British Bankers' Association & BBA Enterprises Ltd. All rights reserved.
For permission to copy please contact BBA Publication Unit.
Any reproduction, republication, transmission or reuse in whole or part requires our consent.