24-213 (L)
*United States v. Wynder, Jr.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2024

(Argued: January 17, 2025          Decided: August 7, 2025)

Docket Nos. 24-213 (L), 24-263 (CON)

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

KENNETH WYNDER, JR., ANDREW BROWN,

*Defendants-Appellants.*[*]

_____

Before:      LIVINGSTON, *Chief Judge*, NARDINI, and MENASHI, *Circuit Judges*.

After improperly withdrawing hundreds of thousands of dollars from an annuity fund for union members, Andrew Brown and Kenneth Wynder, Jr., were convicted of wire fraud and conspiracy to commit wire fraud.   Wynder was also convicted of tax evasion and conspiracy to defraud the United States.   Brown and Wynder now challenge their convictions and sentences by alleging improper joinder of their cases, insufficient evidence to convict, prosecutorial misconduct,

_____

[*] The Clerk is respectfully directed to amend the caption of this case.

ineffective assistance of counsel, and error in the district court's restitution calculation. Because we conclude that Brown and Wynder's cases were properly joined, that Wynder's counsel was not *per se* ineffective, and that Brown and Wynder's other arguments are without merit, we **AFFIRM** the judgment of the district court.

FOR APPELLEE:  ANDREW ROHRBACH (Eli J. Mark, Jacob R. Fiddelman, *on the brief*), Assistant United States Attorneys, *for* Jay Clayton, United States Attorney for the Southern District of New York, New York, NY.

FOR DEFENDANTS-APPELLANTS:  TIMOTHY P. MURPHY, Federal Public Defender, Western District of New York, Buffalo, NY, *for Kenneth Wynder, Jr.*

BRIAN A. JACOBS (Nathaniel J. Sobel, *on the brief*), Morvillo Abramowitz Grand Iason & Anello P.C., New York, NY, *for Andrew Brown*.

DEBRA ANN LIVINGSTON, *Chief Judge*:

This is an appeal by two fiduciaries—Defendants-Appellants Kenneth Wynder, Jr., and Andrew Brown—who were convicted for their roles in improperly withdrawing hundreds of thousands of dollars from a retirement fund they administered for the Law Enforcement Employees Benevolent Association ("LEEBA"). After a one-week jury trial in the United States District Court for the Southern District of New York (Castel, *J.*), Brown and Wynder were convicted of wire fraud and conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349. Wynder

2

was also convicted of conspiracy to defraud the United States, 18 U.S.C. § 371, and four counts of tax evasion, 26 U.S.C. § 7201.

On appeal, Brown and Wynder raise separate challenges to their convictions and sentences. Brown asserts: (1) that the district court should have severed his trial from Wynder's, Fed. R. Crim. P. 8(b), 14(a); (2) that the evidence was insufficient for the jury to conclude he had fraudulent intent; (3) that the district court abused its discretion in declining to impose more severe sanctions for the government's discovery errors; and (4) that the government's statements during summation amounted to prosecutorial misconduct warranting a new trial. Wynder contends: (1) that he was *per se* deprived of his Sixth Amendment right to effective assistance of counsel because his lead trial attorney was suffering from a degenerative brain disease; and (2) that the district court plainly erred in calculating restitution by failing to account for the benefits union members received.

None of these claims have merit. Although we consider each argument in turn, we write primarily to address the joinder, sufficiency of the evidence, and ineffective assistance of counsel arguments. Specifically, we conclude that Brown and Wynder's trials were properly joined because the indictment

sufficiently alleged causal and financial links between the tax and fraud offenses. Some of the funds Wynder failed to report to the Internal Revenue Service ("IRS") sourced from the fraud scheme—and, in fact, would not have been available to Wynder without the improper withdrawals. We similarly affirm Brown's conviction as supported by evidence in the record, most notably his communications with Wynder and LEEBA members. These communications demonstrated not only that Brown knew the withdrawals were improper, but also that he derived a benefit from the scheme, including, on one occasion, using the withdrawn funds to resuscitate a souring business relationship. Finally, we conclude that the degenerative brain disease from which Wynder's attorney suffered did not rise to *per se* ineffective assistance of counsel. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

### I. Factual Background[1]

LEEBA is a labor union representing law enforcement personnel at various New York City agencies. LEEBA members employed by certain City agencies

---

[1] Because the jury convicted Brown and Wynder at trial, we summarize the facts in the light most favorable to the government. *See United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008).

4

could participate in LEEBA-administered funds, including a welfare fund ("Welfare Fund"), which offered non-retirement benefits such as a life insurance plan, and an annuity-based retirement fund (the "Annuity Fund"), comprised of individual retirement accounts held by an independent third-party custodian. The City contributed directly to these funds, which LEEBA administered on behalf of its members.

From 2012 to 2020, Kenneth Wynder was the President of LEEBA. As President, Wynder had control over LEEBA's operating account. Wynder was also a plan administrator and a trustee of LEEBA's Annuity Fund. Under the terms of its agreements with New York City agencies, which Wynder signed, LEEBA could withdraw money from the Annuity Fund only to pay reasonable expenses for administering the Fund. As LEEBA members with accounts in the Fund were informed, "Your annuity is *yours*. [It] belongs to you, *not the union*." JA-999 (emphasis added).[2] Yet, from 2012 to 2020, Wynder withdrew or attempted to withdraw hundreds of thousands of dollars from the Annuity Fund and transferred the money to LEEBA's operating account. In so doing, Wynder

---

[2] Citations to the record are as follows: "JA" refers to the joint appendix submitted by the government and Wynder. "A" refers to the appendix that Brown individually filed. "SPA" refers to the special appendix submitted by Brown.

5

was able to take control over the funds and siphon them to pay for routine union expenses—and for his own benefit.

To accomplish these withdrawals, Wynder enlisted the help of his friend, Andrew Brown. Brown operated a financial services firm, Strategic Planning Services, through which he served as LEEBA's "benefits coordinator" and, *inter alia*, brokered insurance benefits for LEEBA, including the Welfare Fund's life insurance plan, from which he earned commissions. Brown also served as the primary financial advisor to the Annuity Fund, earning commissions on investments in the Annuity Fund as well.

Brown or one of his staff, at his direction, prepared special authorization fee forms that authorized Wynder to withdraw money from the Annuity Fund. Wynder signed the forms, and Brown submitted them to Ascensus, a third-party financial services firm and the Annuity Fund's custodian. The forms included the following certification: "I have considered the plan document provisions, rules and regulations regarding plan expenses and authorize Ascensus to debit the plan for the following expenses." "By signing this form, I understand I am authorizing a single deduction of the listed expenses from plan assets . . . ." A-623–24.

6

Over the course of seven years, Brown and Wynder made 17 withdrawals from the Annuity Fund. Each special authorization fee form required them to specify the purpose of the withdrawal and to attach a corresponding invoice. Most of the 17 forms characterized the withdrawals as paying for "Administrative Fees" or "Administrative Management" costs. These explanations, and their associated invoices, were false.[3] Brown and Wynder withdrew sums far in excess of actual administrative costs and, as their communications revealed, for purposes unrelated to the management of the Annuity Fund. On one occasion, for example, Wynder directed Brown to draw $60,000 from the Annuity Fund and to list the purpose of the withdrawal as "janus decis[i]on," a reference to *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 585 U.S. 878 (2018), a Supreme Court decision that potentially impacted LEEBA's collection of union dues, but that was unrelated to operation of the Annuity Fund.[4] A-710. Brown omitted this purpose on the special authorization fee form, substituting it

---

[3] Acting on Brown's instructions, Brown's staff generated invoices on LEEBA letterhead for each withdrawal. These invoices reflected purported expenses incurred by the union, supposedly in administering the Annuity Fund.

[4] *Janus* held that the First Amendment prohibits requiring nonmember public-sector employees to pay union dues without their affirmative consent. 585 U.S. at 930.

7

for an apparently proper purpose: "Administrative Management/Cost." A-623. Wynder thereafter signed the form.

In addition to lying on the special authorization fee forms, Brown and Wynder lied to LEEBA members about the purpose of their withdrawals. When one LEEBA member confronted Brown about money missing from his account, Brown claimed the withdrawals were a "loan" against member accounts to help LEEBA fight a lawsuit against New York City.[5] JA-1193–95. Wynder similarly told another LEEBA member that the union needed some money for legal fees. Brown and Wynder promised to pay LEEBA members back once these supposed legal battles were over. They never did.

During this period, LEEBA was subject to two audits, one by the Office of the New York City Comptroller, and the other by S. A. Koenig Associates ("S. A. Koenig"), an independent accounting firm LEEBA had retained. Throughout the auditing process, Brown and Wynder stalled, providing incomplete information to auditors and taking weeks to deliver readily accessible documents. Ultimately, the Comptroller audit concluded that LEEBA had not complied with

---

[5] When confronted by a LEEBA officer and trustee of the Annuity Fund, Brown later denied giving this explanation, falsely claiming instead that the money may have been withdrawn for an audit.

8

reporting requirements under Directive 12, a New York City regulation setting forth "accounting, auditing, and financial guidelines for employee and retiree Benefit Funds, which receive contributions from The City of New York." A-444. In a meeting with Wynder and Brown, the auditors also expressed concern that LEEBA was improperly sharing expenses between funds. The S. A. Koenig audit similarly resulted in a notification to Wynder that LEEBA had improperly withdrawn money from the Annuity Fund in an amount greater than would have been necessary for administrative expenses. Although Wynder promised to return the money from these improper withdrawals, he and Brown continued their scheme.

In total, Brown and Wynder withdrew $529,000 from the Annuity Fund. Most of these funds were transferred to LEEBA's operating account. From LEEBA's newly enriched coffers, Wynder withdrew money to, *inter alia*, pay for a luxury car, travel to Texas for a football game, and pay himself beyond his Board-authorized salary. Because Wynder concealed these payouts, LEEBA underreported his income on its payroll and other tax forms. Wynder also failed to file any personal tax returns from 2015 to 2018, and thus did not disclose these additional payouts to the IRS.

Brown, in contrast, did not receive money directly from the withdrawals. But he convinced Wynder to divert $40,000 from the Annuity Fund to pay overdue life insurance premiums associated with LEEBA's Welfare Fund. The premiums had nothing to do with the administration of the Annuity Fund, but their nonpayment threatened to upset Brown's professional relationship with the insurance company and to cut off his commissions. In texts and emails, Brown emphasized that LEEBA "REALLY need[ed] to get this bill paid" and that he expected that "the distributions made from the Annuity Fund" would be used to do so. A-737. Brown prepared a special authorization fee form for $40,000—the amount of the overdue premiums—telling Wynder, "Let me know if you want more. I'll write 'audit' as [the] reason." JA-1718. Brown ultimately listed the reason as "administrative management." A-635. After Ascensus turned over the requested $40,000 to LEEBA, the union made a bulk payment to the insurance company for its delinquent premiums, which prevented Brown's relationship with the insurance company from souring and secured his commissions.

## II.   Procedural History

### A. The Indictment

10

In July 2021, a grand jury returned a superseding indictment against Brown and Wynder, charging them with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, as well as wire fraud in violation of 18 U.S.C. § 1343. Wynder was also charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and with four counts of tax evasion in violation of 26 U.S.C. § 7201.[6] Brown moved to sever his trial from Wynder's, asserting that the indictment did not sufficiently connect the wire fraud conspiracy to Wynder's tax-related offenses. The district court concluded that joinder of the tax and wire fraud offenses was proper. Judge Castel also denied Brown's motion to sever due to a lack of prejudice, reasoning that the joined tax offenses did not introduce inflammatory material into the case and that prejudice would be mitigated by charging the jury that "guilt or lack of guilt is an individual issue for each defendant."[7] *See* JA-69–70.

---

[6] An earlier indictment had also charged Steven Whittick, LEEBA's treasurer, alongside Wynder (but not Brown). Whittick pled guilty to two counts: (1) conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and (2) false statements to federal agents in violation of 18 U.S.C. § 1001(a).

[7] At trial, the district court instructed that although there were two defendants on trial, the jury had to "consider each count of the indictment and each defendant's involvement in that count separately." JA-1360. "Guilt is personal and individual." *Id.* A "verdict of guilty or not guilty must be based solely upon the evidence about each defendant." *Id.*

**B. Discovery**

Less than one month before trial, the government informed the court that it had inadvertently failed to disclose approximately 400,000 pages of relevant documents. Some of these documents, the government explained, were stored externally and, as a result, were overlooked in production. Other documents, which S. A. Koenig provided the government, were never downloaded and saved by the government. Brown and Wynder did not contend that the government's discovery errors were a product of bad faith. But they sought, *inter alia*, the issuance of an adverse inference charge regarding the withheld documents.

The district court agreed sanctions were warranted in response to the government's "serious and repeated neglect." *United States v. Wynder*, No. 20-CR-470, 2022 WL 3572881, at *5 (S.D.N.Y. Aug. 19, 2022). But it found an adverse inference instruction or preclusion to be inappropriate due to the absence of bad faith. Instead, the district court ordered the government to produce Jencks Act material, *see* 18 U.S.C. § 3500, and draft exhibit and witness lists 90 days before trial and to detail the ameliorative measures it was taking to reduce the risk of recurrent discovery errors. The court also granted a continuance of approximately seven months.

12

## C. Trial

Trial commenced on May 22, 2023. Over the course of one week, the government presented, *inter alia*, the testimony of LEEBA members who recounted both the dwindling sums in their Annuity Fund accounts and the explanations Brown and Wynder provided when confronted about it. Employees of Ascensus and Strategic Planning Services explained how Brown and Wynder used special authorization fee forms to make withdrawals. While Ascensus authorized withdrawals for administrative expenses, it would deny withdrawal requests for purposes "unrelated to the plan," such as paying for insurance benefits. JA-688. Emails and texts showed that Brown and Wynder coordinated to withdraw money from the Annuity Fund to pay, for example, for life insurance—but told Ascensus these withdrawals were for administrative expenses. And bank records traced withdrawals from the Annuity Fund to LEEBA's operating account, from which Wynder derived his unreported income. Auditors testified that such practices were improper—and shared that their attempts to assess LEEBA's compliance were stymied by Brown and Wynder's delayed production of documents. Ultimately, LEEBA's obstruction became so severe that the City of New York

13

placed its welfare and annuity payments to LEEBA in escrow—effectively cutting the union off.

During his defense case, Wynder offered a stipulation and summary charts reflecting legitimate transactions in LEEBA's bank accounts. Brown cross-examined the government's witnesses but did not otherwise present a defense case.

On May 30, 2023, the jury returned a verdict of guilty on all counts.

### D. Post-Trial and Sentencing

After trial, Brown renewed his motion pursuant to Federal Rule of Criminal Procedure ("Rule") 29 for a judgment of acquittal and also moved for a new trial pursuant to Rule 33(a). He claimed principally that the government had conflated him with Wynder, and that there was not sufficient evidence establishing that he knew the Annuity Fund withdrawals were improper.[8] Wynder did not move for post-trial relief. But shortly after the trial, Wynder's principal trial counsel, George Goltzer, withdrew for health-related reasons. He died a few months later. Wynder's new counsel sought bail pending appeal,

---

[8] Brown also sought bail pending appeal on the same basis.

contending that Goltzer's illness raised "questions about his ability at the time to present an effective defense on Mr. Wynder's behalf." JA-1942.

The district court denied Brown and Wynder's requested relief. As to Brown, the district court pointed to Brown's lies to union members and to two instances "where Brown intentionally put a permissible administrative expense as the reason for the withdrawal instead of the true reason" as supporting the conclusion that he had fraudulent intent. *United States v. Wynder*, No. 20-CR-470, 2023 WL 6620113, at *3 (S.D.N.Y. Oct. 11, 2023). As to Wynder, the district court denied bail pending appeal because "Mr. Goltzer was a vigorous and effective advocate in front of [the] jury," who was "performing at a very high level in the trial." JA-1946.

The district court sentenced Wynder to a 40-month term of imprisonment, followed by three years of supervised release, and Brown to an 18-month term of imprisonment, followed by three years of supervised release. It also ordered that Wynder and Brown, jointly and severally, pay restitution of $529,000—the amount improperly withdrawn from the Annuity Fund—to union members and their retirement accounts, and that Wynder pay additional restitution of $309,683.62 to

15

the IRS.[9]    Finally, it required Wynder and Brown respectively to forfeit $529,000

and $3,049.08 and pay mandatory special assessment fees of $700 and $200.

Brown and Wynder appealed.

## DISCUSSION

### I.  Joinder of Wynder and Brown's Cases

Brown argues that the district court erred by joining his counts with

Wynder's under Rule 8(b).   In the alternative, he asserts that the district court

abused its discretion by failing to sever the trials under Rule 14(a), and that this

failure caused him severe prejudice.   We conclude that joinder was proper and

that the district court did not abuse its discretion in declining to sever Brown's and

Wynder's trials.

#### A. Rule 8(b)

We review the propriety of joinder *de novo*, looking to what is alleged in the

indictment.   *United States v. Shellef*, 507 F.3d 82, 96 (2d Cir. 2007), *abrogated on other*

*grounds by Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025); *United States*

*v. Rittweger*, 524 F.3d 171, 177–78 (2d Cir. 2008).   Erroneous joinder requires

---

[9] A portion of the restitution to the IRS—$116,033.03—was payable jointly and
severally with Whittick.

16

reversal only where it resulted in actual prejudice to the defendant "because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Litwok*, 678 F.3d 208, 217 (2d Cir. 2012) (quoting *Shellef*, 507 F.3d at 100).

An indictment may charge two or more defendants together if they "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). We interpret "same series of acts or transactions" to allow for joinder where "two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'" *Rittweger*, 524 F.3d at 177 (citation omitted). With this context in mind, we ask if, "in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *Id.* (citation omitted).

Here, the indictment charged that, from 2012 to 2019, Wynder and Brown made "hundreds of thousands of dollars of fraudulent transfers from the Annuity Fund to LEEBA's operating account," and used these funds "to enrich" Wynder "through unauthorized and excessive checks to Wynder and cash withdrawals."

17

JA-42, 44.  Without these transfers, "the LEEBA operating account would have been insolvent" and unable to fund these under-the-table payments to Wynder. JA-44.  After obtaining payments from LEEBA "in various forms," Wynder "caused LEEBA to fail to report those payments to the IRS" as wages or income. JA-52.  He additionally "failed to file any personal income tax returns for the years 2015, 2016, 2017, or 2018."  *Id.*

A "commonsense" reading of the indictment leads us to conclude that the fraud and tax offenses were properly joined.  *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988).  The indictment charged that Wynder failed to report *any* of his income from 2015 to 2018.  From 2012 to 2020, Wynder derived income from unauthorized withdrawals from LEEBA's operating account, including sums fraudulently transferred from the Annuity Fund "to enrich" Wynder.  JA-44. Thus, the indictment plausibly alleged that at least *some* of Wynder's unreported income "was the fruit" of the wire fraud scheme.[10]  *See United States v. Yefsky*, 994

---

[10]  Brown suggests that all of the fraudulent transfers made from the Annuity Fund to LEEBA's operating account for the purpose of "enrich[ing]" Wynder may have occurred before or after the years in which Wynder committed tax fraud.  JA-44.  But "applying a commonsense rule to the[] facts" alleged in the indictment, "a reasonable person would easily recognize" the likelihood of overlap.  *Turoff*, 853 F.2d at 1044.

18

F.2d 885, 895 (1st Cir. 1993) (affirming joinder on this basis); *United States v. Anderson*, 809 F.2d 1281, 1288 (7th Cir. 1987) (same).

Brown asserts that tax and fraud offenses cannot be joined where they share only *some* common identity of funds. Not quite. It is true that we have declined to find "the essential connection for joinder" where the majority of "the funds that formed the basis of the unreported income" were "not derived directly" from the joined offense. *Turoff*, 853 F.2d at 1044; *see also Shellef*, 507 F.3d at 98–99 (concluding there was misjoinder where funds generated by wire fraud scheme postdated tax counts). But at the same time, we have acknowledged that a tax count "need not be severed just because it includes a small amount of unreported income" from sources other than the joined offense. *United States v. Biaggi*, 909 F.2d 662, 676 (2d Cir. 1990). The "limit[]" to this principle depends on the specific indictment at hand. *See id.*; *Rittweger*, 524 F.3d at 177–78. Thus, even if the "character of the funds derived do not convince us of the benefit of joining the[] two schemes in one indictment, *other overlapping facts or issues may*." *Turoff*, 853 F.2d at 1043–44 (emphasis added).

We need not decide whether the "character of the funds" alone might justify joinder here, as the indictment provides another "key link" between the offenses.

19

*Id.* LEEBA was insolvent. "Without the[] improper withdrawals from the Annuity Fund," LEEBA would not have been able to pay for "the excessive checks that Wynder caused to be written to himself, and for the cash withdrawals and the personal expenses that Wynder caused to be charged to that account." JA-44–45. Wynder received $400,000 in "actual and constructive payments" from LEEBA between 2015 and 2018 and failed to report more than $650,000 "in income that he received in total from LEEBA in those years." JA-52. Thus, while the income Wynder failed to report to the IRS may not have derived entirely from the Annuity Fund, much of his unreported income likely was made possible through his scheme with Brown. "Proof of one scheme was helpful to a full understanding of the other." *Biaggi*, 909 F.2d at 676; *see United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016) (summary order). The indictment therefore alleged a substantial identity of facts warranting joinder of the fraud and tax offenses.

### B. Rule 14(a)

Even where joinder is proper, a district court may sever trials where joinder "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). Such prejudice exists when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

20

about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Because motions to sever are "committed to the sound discretion of the trial judge," *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988), we will reverse only where the defendant demonstrates prejudice "so severe as to amount to a denial of a constitutionally fair trial," *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (citation omitted), or a "miscarriage of justice," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991) (citation omitted).

Brown has not convincingly shown prejudice from the denial of his severance motion. As discussed further below, the only prejudice to which Brown points is his perceived link with Wynder, including when the government referred to them together in opening and summation. But this showing, "without more," is insufficient to establish a miscarriage of justice. *See United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *Rittweger*, 524 F.3d at 179–80. That is particularly true here, where the evidence related to Wynder's tax offenses was "simple enough for the jury to consider without significant spillover effect." *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983). The district court further mitigated any potential prejudice by instructing the jury to consider "each defendant's involvement in [each] count separately" and reach a verdict "based

21

solely upon the evidence about each defendant." JA-1360; *see Zafiro*, 506 U.S. at 541; *United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982). Because Brown has not demonstrated the requisite prejudice, the district court did not abuse its discretion in refusing to sever his case from Wynder's. *See United States v. Rahman*, 189 F.3d 88, 122 (2d Cir. 1999); *United States v. Downing*, 297 F.3d 52, 59–60 (2d Cir. 2002).

## II. Sufficiency of the Evidence Supporting Brown's Conviction

Brown next contends the evidence was insufficient to sustain his convictions for wire fraud and conspiracy to commit wire fraud because there was no direct evidence of his intent to defraud LEEBA members. We review challenges to the sufficiency of the evidence *de novo*. *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014). Under this "exceedingly deferential standard of review," we view the evidence in the light most favorable to the government, resolving all reasonable inferences in its favor and deferring to the jury's determinations of credibility. *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008); *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011). We will affirm a conviction where "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (citation omitted).

22

For the following reasons, we conclude that Brown has not met the "very heavy burden" of demonstrating the evidence was insufficient as a matter of law. *United States v. Buck*, 804 F.2d 239, 242 (2d Cir. 1986) (citation omitted).

To establish a conspiracy, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) (quoting *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010)). Although it need not prove "the defendant's familiarity with all of the conspiracy's details" or an express agreement on a course of action, *Anderson*, 747 F.3d at 61, "the government 'must prove at least the degree of criminal intent necessary for the substantive offense itself,'" *Torres*, 604 F.3d at 65 (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975)). For violations of 18 U.S.C. § 1343, the government must establish that the defendant had "specific intent to obtain money or property by means of a fraudulent scheme," *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007), "regardless of whether he seeks to leave the victim economically worse off," *Kousisis*, 145 S. Ct. at 1392. The government may prove such intent through circumstantial evidence, such as "by showing that [a] defendant made misrepresentations to [victims] with knowledge that the statements were false."

23

*United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)).

When reviewing a conspiracy conviction for sufficiency of the evidence, our deference to the verdict is pronounced. That is because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Anderson*, 747 F.3d at 73 (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). "[T]he jury's verdict may be based entirely on circumstantial evidence" and inferences drawn therefrom. *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)). A "single act may be sufficient for an inference of involvement in a criminal enterprise" if it is "of a nature justifying an inference of knowledge of the broader conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

Here, Brown's authorization of the $40,000 withdrawal from the Annuity Fund to pay the overdue insurance premiums of the Welfare Fund firmly supports an inference of his fraudulent intent. The evidence at trial demonstrated that Brown initiated this withdrawal to benefit his own interests. As benefits

24

coordinator, Brown received commissions on the premiums LEEBA paid. And Brown's contemporaneous communications suggest that broader reputational considerations were also at play—both for himself and for LEEBA. Brown emphasized that he did "a LOT" of business with the insurance company and gave his "word" that LEEBA would pay the bill "in three months." A-737. If LEEBA did not pay, Brown could "no longer do business with [the company] because they did this [payment] extension based on [his] reputation." A-742. This was not an exaggeration—Brown had already lost business from clients "stiffed" by LEEBA. A-743. LEEBA's failure to pay these bills would create a "PR nightmare" for the union, likely resulting in a lawsuit and an inability to "secure a policy in New York" pending its resolution. A-737.

The authorization form for the $40,000 withdrawal indicates that Brown was aware that its true purpose was impermissible. Brown initially told Wynder that he would "write 'audit' as [the] reason" for the withdrawal. JA-1171. Yet he wrote "administrative management" on the special authorization fee form. A-635. There is no doubt that "audit" was an inaccurate description for the insurance payment—and that Brown would have been aware of its falsity. Brown also would have known that "administrative management" was an

25

inaccurate description. Indeed, he had attended an audit meeting at which compliance with rules and regulations regarding withdrawals from the Annuity Fund for administrative expenses was a topic of discussion. And paying the expenses of the Welfare Fund, including its life insurance premiums, was not a proper expense.

Moreover, the record contains other occasions on which Brown, on his own initiative, described withdrawals as "administrative management" expenses in circumstances confirming that he knew these withdrawals, too, were fraudulent. When Wynder told Brown that he needed $60,000 as an "early withdrawal" and to say it was for the "janus decis[i]on," Brown instead claimed the withdrawal was for "Administrative Management/Cost." A-710, 623. Brown knew that had he written "*Janus* decision" on the special authorization fee form, as Wynder directed, Ascensus would have declined to authorize the withdrawal. So Brown provided another explanation.

If administrative management was truly the reason that Brown and Wynder initiated these withdrawals, they would have had no reason to claim otherwise to LEEBA members. But that is what Brown repeatedly did when confronted by LEEBA members about irregularities in their accounts. At trial, a union member

testified that Brown told him that LEEBA planned to use these withdrawals to "fight the City of New York in upcoming legal battles." JA-1194. But no such legal battles were in the offing. And Brown's inconsistent explanations, when viewed alongside his financial motives and his communications with Wynder, all support the conclusion that Brown had the requisite fraudulent intent. *See Guadagna*, 183 F.3d at 129–30; *Jabar*, 19 F.4th at 76.

Brown's reliance on *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), is unavailing. In that case, we reversed the defendants' wire fraud convictions because we determined that the evidence was insufficient to prove the defendants' representations were false. *Id.* at 843. Deutsche Bank, where the *Connolly* defendants worked, was required to submit "the rate at which it could borrow funds" to the British Bankers' Association ("BBA"), upon which the BBA would rely to set the London Interbank Offered Rate ("LIBOR"). *Id.* at 825–26 (emphasis omitted). Despite evidence that the defendants knew the interest rates they submitted were skewed to benefit the traders' positions, we determined that the government had not presented evidence that those submissions were rates at which defendants' bank *could not borrow*. *Id.* at 829, 835–37. In other words, the government did not prove that, in the context of the BBA LIBOR instruction, the

27

defendants' statements were false. *Id.* at 834, 842–43. That defect is not present here. Brown was not asked to state a purpose for which LEEBA *could* withdraw money from the Annuity Fund. The special authorization fee form required him instead to state how LEEBA intended to use the withdrawn funds. As already discussed, the government presented evidence that Brown's statements regarding the purpose of the withdrawals were false and that Brown knew as much. Because a rational juror could have found the essential elements of the crime based on the record here, the evidence was more than sufficient to support Brown's conviction.

## III. Ineffective Assistance of Counsel

Wynder alleges that his principal trial counsel, George Goltzer, was ineffective because he was suffering from Creutzfeldt-Jakob Disease ("CJD"). CJD is a fatal, fast-moving neurodegenerative disease. Wynder claims that the timeline for Goltzer's illness aligned with his trial. During jury selection in March 2023, Goltzer collapsed and was taken to the hospital. In August, just two months after the verdict, Goltzer withdrew as counsel due to his deteriorating health. He died in December, a few weeks before Wynder's sentencing.

28

Wynder argues that Goltzer's disease *per se* deprived him of effective assistance of counsel and a fair trial. We disagree.

We analyze claims of ineffective assistance of counsel under the *Strickland* framework, which requires a defendant to show (1) that his attorney's performance "fell below an objective standard of reasonableness," and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In rare situations, "a defendant may establish *per se* ineffective assistance of counsel, which means that he need not make a particularized showing of prejudice to obtain relief." *United States v. Rondon*, 204 F.3d 376, 379 (2d Cir. 2000); *see United States v. Luciano*, 158 F.3d 655, 661 (2d Cir. 1998). We have recognized *per se* ineffective assistance of counsel only in an extremely limited set of circumstances, however, such as when an attorney is not duly licensed to practice law or is implicated in the defendant's crimes. *Luciano*, 158 F.3d at 661; *Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993).

Goltzer's illness, while tragic, does not fall into these "egregious circumstances." *Luciano*, 158 F.3d at 661. "[T]here is simply nothing inherent in an attorney's illness that necessarily will impede a spirited defense 'most of the

29

time' to justify finding the attorney's representation *per se* ineffective." *Bellamy v. Cogdell*, 974 F.2d 302, 308 (2d Cir. 1992) (en banc). "[G]iven the varying effects health problems can have on an individual's ability to function," ineffective assistance of counsel claims based on attorney illness are better suited to *Strickland*'s fact-specific inquiry. *Id.; see United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (per curiam). Indeed, Wynder himself concedes that CJD's symptoms and progression can vary from case to case.

In the event we are not persuaded that he has established *per se* ineffective assistance of counsel, Wynder encourages us to find Goltzer was ineffective because his CJD prevented him from cross-examining key witnesses and providing a vigorous defense. He also contends his post-trial attorney was ineffective for failing to take any action regarding Goltzer's condition. "When faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Ramos*, 677 F.3d 124, 129 (2d Cir. 2012) (citation omitted). Due to our "baseline aversion to resolving

30

ineffectiveness claims on direct review," we decline to consider Wynder's alternative ineffective-assistance argument at this time. *Id.* (citation omitted). Wynder may pursue this claim in a petition for writ of habeas corpus under 28 U.S.C. § 2255.

**IV.    Other Challenges**

Brown advances two arguments for a new trial based on alleged government misconduct.   He first challenges the district court's failure either to preclude the government from introducing the documents it failed timely to disclose or give an adverse inference instruction.   We review the district court's response to nondisclosure for abuse of discretion.   *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997).   Faced with the government's failure to comply with discovery rules, a district court may order the government to permit discovery, prohibit it from introducing the undisclosed evidence, grant a continuance, or "enter any other order that is just under the circumstances."   Fed. R. Crim P. 16(d)(2).   Reversal is warranted only where the nondisclosure "results in substantial prejudice to the defendant."   *United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir. 1990).

We discern no abuse of discretion here. The district court sanctioned the government by granting a continuance and requiring the government to accelerate its pretrial disclosures and explain the remedial measures it was taking. Preclusion of evidence—in addition to these existing sanctions—is a drastic remedy and is not warranted where, as here, the parties agreed that the nondisclosure was not a product of bad faith. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 954–55 (2d Cir. 1990); *United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998).[11] Moreover, the prejudice to which Brown points—being forced to review hundreds of thousands of new documents in advance of trial—is not the kind of "adverse[] [e]ffect[]" on trial strategy justifying reversal. *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994); *Miller*, 116 F.3d at 681.

Brown next seeks a new trial by arguing that the prosecutor committed reversible error in summation by using the terms "they" and "them" to describe conduct supposedly attributable only to Wynder. Because Brown "did not object at trial to the statements forming the basis of [this claim], the plain error standard applies." *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012). And to obtain

---

[11] We similarly conclude that the district court did not abuse its discretion in declining to give an adverse inference instruction in light of the other sanctions it adopted.

a reversal of his conviction based on alleged prosecutorial misconduct during summation, Brown must show "not simply that a particular summation comment was improper, but that the comment, viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, such that the resulting conviction was a denial of due process." *Id.* (citations, internal quotation marks, and brackets omitted); *see United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993). Brown has not shown prosecutorial error in summation, much less a violation of due process.

In summation, the government highlighted evidence that showed Brown's and Wynder's fraudulent intent. The government emphasized, for example, Brown's and Wynder's lies to LEEBA members and to Ascensus regarding the purpose of the withdrawals. The government argued that Brown and Wynder clearly knew their withdrawals were improper "because the auditors made [the rules] crystal clear." JA-1259. Auditors told Wynder that withdrawals from the Annuity Fund had to be repaid, but "[t]hey continued to take money out." JA-1245. "[T]he defendants kept doing their fraud even after they'd gotten a warning from the auditors." *Id.* The government further argued that Wynder and Brown attempted to cover their tracks by "obstructing the audit"—Brown, by

33

being "slow to produce documents and produc[ing] them inconsistently," and Wynder, by eventually refusing to cooperate altogether. JA-1266–68, 1271. Finally, the government charged that LEEBA's recordkeeping helped to conceal the fraud. "Wynder and Brown never did a formal time analysis. They never did an expense sharing agreement. They didn't want to do a careful analysis, because a careful analysis wouldn't have let them take money whenever they wanted, however much they wanted." JA-1248.

The government "has broad latitude in the inferences it may reasonably suggest to the jury during summation." *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)). In this case, the government presented ample evidence to support its statement that *both* Brown and Wynder "were obstructing the audit." JA-1266. LEEBA auditors testified that, although some information they requested should have been "readily available," Brown took weeks to provide it—and when he did, it was often "incomplete." JA-910, 916. The government also provided evidence that LEEBA "outsource[d] a lot of the recordkeeping functions to Drew Brown," and therefore was entitled to suggest in summation that Brown was partially responsible for LEEBA's bookkeeping failures. JA-915. Finally, the government

34

could reasonably suggest that Brown and Wynder "continued to take money out even after [S. A. Koenig] told them" the withdrawals were improper and had to be repaid. JA-1245. Brown's participation in interviews for that audit, attendance at one or more audit meetings, and responsibility for recordkeeping suggest that he had knowledge of—and continued in spite of—"a warning from the auditors." *Id*. Because the government's statements in summation "were by no means unreasonable in light of the evidence presented at trial," we conclude Brown's claims of prosecutorial misconduct lack merit. *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005); *Coplan*, 703 F.3d at 87.

Last, Wynder contends that the district court erred in ordering him to pay $529,000, the amount withdrawn from the Annuity Fund, in restitution. This calculation, he claims, was in excess of the amount of the loss to victims, because it included funds used to pay for insurance premiums, attorney and accounting fees, and healthcare—services which at least indirectly benefited members. *See United States v. Nucci*, 364 F.3d 419, 423–24 (2d Cir. 2004); *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006). As proof, Wynder points to a list of checks issued from LEEBA's accounts paying for such services. We review Wynder's

35

unpreserved objection for plain error. *See United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016).

Here, we need only consider the second prong of the plain error test— whether any error was plain—to affirm. *See United States v. Marcus*, 560 U.S. 258, 262 (2010). Wynder is correct that the Mandatory Victims Restitution Act requires the court to impose restitution in the "the full amount of each victim's losses," but not in excess thereof. 18 U.S.C. § 3664(f)(1)(A); *United States v. Pescatore*, 637 F.3d 128, 139 (2d Cir. 2011). Even so, restitution requires only a "reasonable approximation of losses," *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013), and may involve factors that are "based on mere probabilities, expectations, guesswork, even a hunch," *United States v. Rainford*, 110 F.4th 455, 490 (2d Cir. 2024) (citation omitted). Here, auditors repeatedly testified that LEEBA failed to separate expenses and deposits of the union, Annuity Fund, and Welfare Fund. Viewed in this light, the expenditures to which Wynder points cannot be readily attributed to withdrawals from the Annuity Fund. Moreover, even if some expenditures could be traced to the Annuity Fund, the fungibility with which LEEBA treated money for the Welfare Fund, Annuity Fund, and operating costs make it far from "clear or obvious" that LEEBA members received

36

value from the misappropriated funds warranting an *offset* of the restitution amount. *Marcus*, 560 U.S. at 262 (citation omitted). Accordingly, the district court's estimation of loss was not plainly erroneous.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.